STATE of Missouri, Respondent,

v.

Roger E. YOKSH, Appellant.

No. WD 54873.

Missouri Court of Appeals,
Western District.

March 23, 1999.

Emmett Queener, Asst. Public Defender, Columbia, for Appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for Respondent.

HANNA, Presiding Judge.

On June 10, 1997, the defendant, Roger E. Yoksh, was found guilty of murder in the second degree, pursuant to § 565.020.1, RSMo 1994, following a jury trial in the circuit court of Clay County. On September 4, 1997, the defendant was sentenced to a term of 30 years imprisonment. On appeal the defendant complains that there was insufficient evidence to prove that he caused the death of the victim, and that the trial judge failed to declare, *sua sponte*, a mistrial when the prosecutor misstated facts during his closing argument. We affirm.

The evidence most favorable to the verdict was that, in April of 1996, Lauri Chance began taking her son, Tristan, to the home of the defendant and his wife, Lori Yoksh, for

day care. Tristan's date of birth was April 24, 1995. On August 22, 1996, Ms. Chance's father dropped Tristan off at the defendant's home at around 7:30 A.M. Although Tristan had suffered from a variety of minor childhood illnesses, on August 22 nd he was in good health and was not suffering from any serious health problems. Tristan was, at that time, past the walking stage, and would run and climb on furniture.

Ms. Chance testified that Mrs. Yoksh referred to Tristan as a "Velcro baby," meaning that he acted "clingy" around her and liked to be held. He tended to cry a lot, but he generally would stop crying if someone picked him up. He also tended to cry less when Mrs. Yoksh was around. The state's witnesses testified, generally, that the defendant complained that Tristan "crie[d] all the time" and referred to Tristan as a "cry baby." Otherwise, Tristan and the defendant got along pretty well. The state's witnesses, including a number of children that the Yokshs babysat, testified that the defendant liked to tease Tristan by yelling "boo" at him and pushing him down on his bottom.

The defendant arrived home from work at about 2:00 P.M. on the afternoon of August 22 nd. Mrs. Yoksh described the defendant as being irritable and grumpy. After taking a shower, he fell asleep on the couch. At around 4:00 P.M., Mrs. Yoksh woke the defendant and left for work, leaving him to care for Tristan and several other children. Mrs. Yoksh testified that when she left for work, she heard Tristan moving around in his crib, and she told the defendant to check on him. She indicated that she did not check on Tristan before she left, but as far as she knew he was fine. There were no other adults in the home. Robert, a ten-year old neighborhood boy, testified that, at the time Mrs. Yoksh left, Tristan was not in his crib but was standing and crawling around the house. About 20 minutes later, Robert talked with Tristan and observed Tristan laughing.

Robert's nine-year old sister, Jenny, told a police officer that, at some later time, Tristan began crying. Apparently he had bumped his head on a door jam. Jenny reported the incident to the defendant, but he was busy

and he told her to "deal with it." Jenny told the officer that she picked Tristan up and set him on the couch. She also told the officer that Tristan cried for 5 to 20 minutes, and then stopped. However, when the defendant entered the room, Tristan began crying again. Jenny told the officer that the defendant went over to Tristan and yelled, "Boo, boy, quiet." Tristan began to cry more, and the defendant said, "That's it, you're going to bed."

Jenny indicated that the defendant carried Tristan down to the back bedroom and she assumed that the defendant was putting Tristan to sleep because she could hear him crying in the back bedroom. The next time she and her brother observed Tristan, at around 4:50 or 5:00 P.M., he was seated on the couch with the defendant. Robert testified that Tristan was acting "kind of tired," and he was making a groaning sound "like he was humming [himself] to sleep." Jenny told the officer that Tristan was rolling and blinking his eyes, and that he was making short, repeated, sucking or hissing noises while he breathed.

Tristan's mother, Lauri Chance, testified that she arrived at the defendant's home to pick up Tristan at around 5:42 P.M. The only other children she observed at the house, besides Tristan, were the defendant's six-year old daughter and the defendant's five-year-old nephew, Derrick. She observed the defendant sitting on the couch by the front door. Ms. Chance said he looked "different," he did not appear to be relaxed and was sitting with his hands hanging between his knees. The defendant got up to greet her, although he usually just stayed on the couch. When she went to get Tristan, Ms. Chance noticed that he appeared to be sleeping on the couch. She indicated that Tristan usually slept in the crib, and he normally took his nap earlier in the afternoon. The defendant told Ms. Chance that Tristan "fell asleep on the floor in front of the TV with his butt in the air and he put him on the couch." When she first looked at her son, she could only see his shoulders and the back of his head because he was partially covered with a thick winter-type blanket, even though it was "very hot" that day.

Ms. Chance testified that she then walked to the dining room to retrieve her diaper bag. When she returned to the couch, she saw that Tristan was lying "kind of on his back, kind of on his stomach." He was being partially propped up with a pillow. When she looked at Tristan's face, she testified that it was a "gray" almost a "neutral color," as there was no "flesh color" to his face. His eyes were open only a little bit and he was breathing in "real short, low, gaspy breaths."

Ms. Chance called Tristan's name, but he did not respond. She testified that she moved her face closer to his and began yelling and screaming his name, in an attempt to wake him up. She then picked him up under his arms and noticed he was limp, his eyes and mouth were slightly open. She began bouncing him on her knee, trying to get a response. She described the shaking as "light," with very little strength, as you would use to wake a sleeping child.

Ms. Chance testified that she asked the defendant, who was now standing behind the couch, for help. In response, the defendant picked up the telephone and called his wife at work, and asked her if "anything had been wrong with Tristan" that day. He hung up and then dialed 911. The 911 call was received at 5:47 P.M. Ms. Chance was still screaming and bouncing Tristan on her knee.

Various police officers and paramedics arrived at around 5:50 P.M. Tristan was unresponsive, his breathing was labored, and they could not detect a pulse. He was transported to Children's Mercy Hospital in an ambulance. While en route to the hospital, paramedics tried unsuccessfully to open an airway to assist his breathing. Tristan was rigid, unconscious, and experiencing some slight seizure activity. Tristan's right pupil was dilated, while his left was constricted. A paramedic surmised that Tristan's symptoms indicated that he was suffering from some type of head injury, but he did not find any external trauma indicative of a head injury.

When Tristan arrived at Children's Mercy at 6:23 P.M., he was pale, actively seizing, and he had a very rapid but regular heartbeat. The emergency room doctor testified that Tristan's soft spot "was actually bulging," which suggested that there was some-

thing causing increased pressure within the skull. Moreover, pronounced differences in the sizes of Tristan's right and left pupils suggested that he might be suffering from some type of right side brain injury. The doctor found no external bruising or swelling of Tristan's scalp indicating a head trauma. Tristan's condition progressively deteriorated. Over time he responded less and less to stimulation, indicating less brain function and worsening injury.

Tristan died at Children's Mercy on August 26 th, four days after he was admitted. The Clay County Medical Examiner, Dr. Thomas Young, testified as to the autopsy results. The autopsy revealed two recent bruises to the back of Tristan's head; the one on the left side was slightly larger than the bruise on the right side, but both were directly in the back of the head and symmetrical. He also testified that "there was a great deal of hemorrhage on the back of the head and on the left side of the head." There were fractures along Tristan's lambdoidal sutures, *i.e.*, the two lines that separate the plates of the skull. In addition, there was a small linear fracture that went down the left side of that fractured lambdoidal suture. There also was a "gaping fracture" that extended to the left side of the head, about one eighth of an inch wide. Additionally, there was a small blood clot over the surface of the brain on the right side, and the brain was markedly swollen and soft.

The autopsy also revealed hemorrhages in Tristan's retinas. Dr. Young testified that such hemorrhages occur when the brain undergoes a "very, very severe motion inside the cranial vault." Hemorrhages such as these are usually caused when a baby is shaken violently, but they can also result from a "very severe impact of the head." Dr. Young also stated that fractures to a child's suture line can only be caused by a "very, very severe blow to the head" or some "very severe force" such as an automobile collision. A fall backward into a doorway, or a fall off of a couch onto a coffee table or the floor, he testified, could not generate sufficient force to cause such a serious injury.

Dr. Young concluded that, in view of the extensive injuries—including the multiple fractures, the swollen brain, the subdural blood clot and the retinal hemorrhages—a child receiving these injuries would not be able to walk or talk and would, in fact, be comatose. As a result, Dr. Young determined that Tristan's head injury was "due to non-accidental causes" and resulted from "blunt head trauma." His injuries were so severe, Dr. Young opined that it was unlikely that Tristan would have survived even if he had received prompt medical attention.

Several medical experts confirmed Dr. Young's conclusions. A pediatric radiologist, who was assigned to Tristan's case on the suspicion of abuse, testified that the C.T. scan of Tristan's head revealed a linear or horizontal fracture through the left side of his skull. The fracture was described as a "coup type of injury," which meant that it had been caused by a direct blow to that part of the skull. The child suffered a similar, but even more severe fracture to the right side of the head, indicating that he had been struck on opposite sides of his head by two different blows. There was an extensive amount of swelling on the right side of his brain. The radiologist further testified that it would "take a fairly severe blow, not the kind of trauma that you might expect around the house on a daily basis, to cause these kind of injuries." Injuries of this type, could be caused, for example, by a child's head striking a windshield of a car or by being thrown from the automobile, a baseball bat to the side of the head, a punch, a kick, or a "significant fall." In his opinion, the two injuries that Tristan received to the opposite sides of his head, resulted from two separate blows, making it unlikely that the child's injuries were caused by accident.

A critical care physician who treated Tristan at the hospital, and first saw him on the morning of August 23rd, testified as to Tristan's course of treatment at Children's Mercy. She testified that during the first 24 hours, Tristan was critically ill but stable. During the next 24 hours he showed subtle signs that he was not responding as well as he had before. Eventually, Tristan lost more and more brain function until he was no longer reactive to any stimulation. The doctor testified that Tristan's death was caused by "a very forceful, critical injury, critical enough to basically kill Tristan." She said it would be extremely unusual to see such a serious brain injury as that suffered by Tristan "in someone who had fallen even up to ten feet." To have suffered such serious injuries, she estimated, a child would have to fall "from a height much more significant than ten feet." Additionally, a pediatrician, who saw Tristan in connection with her duties on a team for at-risk children, agreed that "severe force" would be necessary to cause the extensive injuries he suffered. She said that she did not believe that "falling off a couch" could generate the amount of force necessary to have caused Tristan's injuries.

Finally, a pediatric ophthalmologist, whose opinion was based on Tristan's medical records, testified regarding Tristan's retinal hemorrhages. A single or even "two or three" blows to the head, he opined, could not cause such injuries. Such injuries could not even be caused by such extreme occurrences as car wrecks, or from children hitting the pavement after being ejected from moving vehicles. He testified that the retinal hemorrhages were caused by "non-accidental trauma, specifically shaken baby syndrome." He said no amount of force alone, however excessive, could cause such injuries. The type of force necessary to cause such injuries was "an acceleration/deceleration force" that "requires a lot of very sharp forward, or very strong forward and backward movement." His opinion was that such injuries are caused by "a very vigorous shaken baby type situation."

The defendant testified in his own defense. He indicated that around 4:15 P.M. on August 22nd, Tristan was crying so he decided to take him back to the bedroom, pursuant to his wife's instructions. The defendant then put him in his crib because that would sometimes stop his crying. At around 4:30 P.M., he changed Tristan's diaper and then brought him back into the living room and sat him down by the play area behind the couch. Since it was close to dinnertime, the defendant testified that he went into the kitchen and started looking in the cabinets

and the refrigerator. He then went downstairs to the basement, where additional dry goods were stored. He came back upstairs and placed the food he obtained on the kitchen counter. One of the children asked for something to drink. The defendant indicated that he went to the garage to get some soda pop from the refrigerator there. After moving several boxes, and stopping to pick up a broken glass jar, he discovered that the refrigerator was frozen. He decided to deal with it later, and retrieved two cans of soda. He testified that he then returned to the kitchen, poured a drink for the child, and then went into the living room.

The defendant estimated that he had left Tristan and the other three children that he was babysitting, unsupervised for "[r]oughly 15 minutes." When he returned to the living room, he noticed that Tristan was lying on the floor in front of the coffee table with his hands and legs tucked underneath his body, and "he had his rear sticking up." Tristan's eyes were closed, and the defendant testified that he thought he was sleeping. The defendant said he let Tristan lie there for a few minutes, then picked him up and laid him on the couch. He said the boy was "limp" but that he didn't notice anything unusual about him, including his breathing.

The defendant further testified that when Ms. Chance came to pick up Tristan he was just getting up off the couch. After retrieving her diaper bag, he testified that Ms. Chance told him that Tristan was breathing funny, but the defendant could not detect anything abnormal about his breathing. He said Ms. Chance then began shouting "Tristan, Tristan" and began shaking him "in a severe fashion." The defendant told her that he did not know what was wrong with Tristan and he testified that he did not offer any assistance because he "wasn't sure what [he] was supposed to be doing." He then called his wife and 911.

The defendant denied that he killed Tristan or that he shook or injured the child in any fashion. The defendant admitted that he would go "boo" or say "boo, baby" to Tristan, and that sometimes he would fall down, but said he was only playing and that he never pushed or poked him.

In the statement that he gave to police shortly after Tristan was injured, he told the police that he knew of no incident that could have caused Tristan's injuries. During his testimony, he conceded that he never indicated to the police that there was a time when he left Tristan alone in the living room. He also never mentioned leaving Tristan and the other children alone while he went to the kitchen, down to the basement and into the garage. In his statement to the police, the defendant indicated that he was reading a newspaper on the couch while Tristan and the other children played nearby. When Tristan got tired of playing, he came over and laid down in front of the television on his stomach, and fell asleep. The defendant said he went over, picked Tristan up, and laid him on the sofa, where Tristan remained until his mother came to pick him up. The defendant told the police that he did not witness any incident that might have caused an injury to Tristan, that he did not do anything himself to cause some injury to the little boy and that he had no idea what might have happened to him.

Mrs. Yoksh testified that she returned to work after the ambulance took Tristan to the hospital. She later went to the police station and told the police what she knew about the incident. She also told the police that her daughter, who was seven at the time of the defendant's trial, told her that Tristan fell off the couch and onto the coffee table shortly after she left for work. Mrs. Yoksh did not know if her daughter saw the incident, or if Derrick, her five year-old cousin, told her about it. Mrs. Yoksh indicated that she did not tell anyone, including her husband, about this before telling the police. She also testified that the defendant would say "boo, baby" to all the kids and that he was just playing with them. She indicated that she never saw anything to make her concerned about how he treated Tristan.

A neurologist testified, on behalf of the defendant, that he reviewed Tristan's medical records, and opined that Tristan suffered only a single fracture to the left side of his skull. He said a single blow could have accounted for the fracture to the left side of the child's skull, and the swelling to the right

side of his brain. He agreed that the blow would have had to have been "very severe." He also explained that the bruises found on the back of Tristan's head could have been from a blow, or could have been from migration of blood to the lowest point of Tristan's head while he was lying on his back in the hospital.

On cross-examination, the neurologist indicated that it was "possible," but "not likely," that Tristan could have suffered the skull fracture from a short vertical fall. He also agreed that Tristan's "massive retinal hemorrhaging" was probably caused by the "child being shaken," and that no amount of shaking would "produce a fracture of the skull." He also said it was "possible," but "not likely," that a child who suffered a serious skull fracture and retinal hemorrhaging "still could be walking around for some period of time" following those injuries. The doctor agreed that children who fall off couches generally do not suffer skull fractures, and that if, as Derrick testified, Tristan's back hit the coffee table before his head did, it was "very unlikely" that he received the skull fracture from the fall, since his back would have absorbed some of the force.

The defendant first argues that the trial court erred in denying his post-trial motion for acquittal, because the evidence was insufficient to prove that he "caused the death of Tristan Chance by causing blunt trauma to him," in that the evidence permitted only speculation as to the cause of Tristan's injuries.

When reviewing the sufficiency of the evidence, this court must consider the evidence and all the inferences reasonably drawn from the evidence in the light most favorable to the verdict. *State v. Grim*, 854 S.W.2d 403, 411 (Mo. banc 1993). As such, in sufficiency of the evidence attacks on criminal convictions, appellate courts must give great deference to the trier of fact. *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998). We accept "as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence, and disregard all evidence and inferences to the contrary." *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989).

In reviewing a sufficiency of the evidence claim, we examine the evidence to determine whether there is sufficient evidence to permit a reasonable juror to find guilt. *State v. Storey*, 901 S.W.2d 886, 895 (Mo. banc 1995). "The test is whether the evidence, so viewed, was sufficient to make a submissible case from which rational jurors could have found that beyond a reasonable doubt that [the defendant] was guilty." *State v. Hopkins*, 841 S.W.2d 803, 804 (Mo.App.1992)(quoting *State v. Seeger*, 725 S.W.2d 39, 40 (Mo.App. 1986)). We do not, however, weigh the evidence, *State v. Villa–Perez*, 835 S.W.2d 897, 900 (Mo. banc 1992), nor do we determine the reliability or the credibility of witnesses. *State v. Idlebird*, 896 S.W.2d 656, 660–61 (Mo.App.1995). Reliability and credibility are issues for the jury. *State v. Sumowski*, 794 S.W.2d 643, 645 (Mo. banc 1990).

The defendant claims that there was insufficient evidence to prove that he caused the death of Tristan by inflicting a blunt head trauma to him. He contends that the jury rejected the state's theory that Tristan's death was premeditated, since it returned a verdict of guilty on second, not first, degree murder. As a result, he claims that the jury "appeared to have convicted him on the basis of a single unexplained blow" and that the evidence "does not support beyond a reasonable doubt that the blow was the result of some criminal agency." Therefore, he argues that the verdict "appears to be simply the result of speculation about the cause of the injuries."

Initially, we note that the defendant's contention that the jury rejected the evidence that he struck Tristan with more than one blow, or that he shook him, is not persuasive. By failing to convict the defendant of first degree murder, the jury was only rejecting the fact that he deliberated prior to killing Tristan. As such, the contention that the jury convicted him on the basis of a single unexplained blow is also not warranted.

■ Accordingly, we review whether there was sufficient evidence to support the conviction of murder in the second degree. If a person, with the purpose of causing serious physical injury to another person, causes that

person's death, he commits murder in the second degree. § 565.021.1(1), RSMo 1994. The state must show that the defendant caused the death of Tristan by causing blunt head trauma to him, and that he was aware that his conduct was "practically certain" to cause Tristan's death. *See State v. Broseman,* 947 S.W.2d 520, 523–24 (Mo.App.1997). The state's theory of the case was that Tristan suffered from at least two severe intentional blows to the head, that he was violently shaken, and that the resulting injuries caused his death. Because the defendant was the only adult with access to Tristan during the time of the injury, it follows that he inflicted the injuries on Tristan. In response, the defendant attempted to show that Tristan only received one accidental blow to the head when he fell off the couch onto a coffee table.

Although it is not clear whether his fatal injuries resulted from one, or from more than one, blow to Tristan's head, it is clear from the expert medical evidence that the head trauma Tristan received was quite severe. The medical examiner testified that the nature of Tristan's injuries indicated a non-accidental cause. All of the state's experts were of the opinion that the injuries that Tristan received could not have occurred from him simply falling off the couch onto a coffee table. In fact, the defendant's own expert testified that this was highly unlikely. Moreover, the state's medical evidence that Tristan was shaken, as indicated by the hemorrhages in his retinas, was not adequately countered by the defendant. Although the defendant contends that Tristan could have received these injuries by being shaken by his mother when she was trying to "wake him up," factual conflicts in the evidence are within the peculiar province of the jury. *State v. Newberry,* 605 S.W.2d 117, 121 (Mo. 1980).

■ The circumstantial evidence presented also supports the state's theory of the case. The defendant was the only adult in the house when Tristan received his injuries. Moreover, there was evidence that the defendant did not like Tristan, and that Tristan's crying irritated him. Finally, two witnesses testified that Tristan was acting normally, and appeared to be healthy, before the defendant was alone with Tristan in the back bedroom. In a circumstantial evidence case, "[t]he circumstances do not need to show absolute conclusions of guilt or impossibility of innocence. Just because other possible hypotheses exist does not contribute reason enough to remove the case from the jury." *State v. Kittrell,* 779 S.W.2d 652, 656 (Mo. App.1989). *See also State v. Franco,* 544 S.W.2d 533, 536 (Mo. banc 1976)(ruling that the jury could reasonably infer, from the collective impact of the circumstantial evidence, that the defendant was guilty of second degree murder).

The conflicting statements made to the police, right after the incident occurred, also undermines the defendant's version of the events. In the case of *State v. Chaney,* the Missouri Supreme Court found that the jury was entitled to believe that the defendant's shifting explanations, coupled with other circumstantial evidence, constituted evidence of "an overall plan to lie to conceal his guilt." 967 S.W.2d at 53. "We do not undertake to decide which of the two versions of the [events that led to the child's injuries] is of greater probative force. That determination is within the province of the jury." *State v. Goforth,* 535 S.W.2d 464, 467 (Mo.App.1976).

■ Additionally, the seriousness of Tristan's injuries "provided, in itself, a basis for inferring defendant knew [his] actions were practically certain to cause serious physical injury." *State v. Candela,* 929 S.W.2d 852, 868 (Mo.App.1996)(finding sufficient evidence for the conviction of second degree murder in a shaken child case in which the defendant was the only adult with access to the child, coupled with circumstantial and medical evidence). "A jury can infer intent to cause physical bodily harm when 'under the circumstances, the prohibited result may reasonably be expected to follow from a voluntary act, irrespective of any subjective desire on the part of the offender to have accomplished the prohibited result.'" *Id.* (quoting *State v. Franklin,* 854 S.W.2d 55, 58 (Mo.App.1993)). *See also State v. Broseman,* 947 S.W.2d at 524. There was substantial evidence, viewed in the light most favorable to the verdict, to warrant the jury

in finding the defendant guilty of second degree murder. The point is denied.

■ In his second point, the defendant complains that the trial court plainly erred and abused its discretion, when it "abandoned its affirmative duty to insure fairness" by failing to declare, *sua sponte,* a mistrial during the state's closing argument. The prosecutor, in his closing argument, suggested that the defendant was engaged in a "cover up" at trial by failing to previously disclose the identity and the statements of his nephew, Derrick, when, in fact, the defendant had disclosed Derrick as a witness prior to trial. The defendant contends that he was prejudiced by the prosecutor's misstatement of the facts in that Derrick's testimony was "key" to the defense, and manifest injustice would result if the error was left uncorrected.

The defense was based on the theory that Tristan's injuries were the result of a single blow to the head. Derrick testified as to a source of impact—Tristan's fall off the couch onto the coffee table—that occurred during a period of time in which the defendant was not present. As a result, the defendant argued that he was not responsible for Tristan's injuries. In response, the prosecutor suggested, in his closing arguments, that the defendant was involved in a "cover up" which included Derrick's testimony. The state argued that:

> [M]ost people who are involved in homicides or crimes don't get caught because someone saw them do it or saw their involvement in it. Most people get caught in the coverup.
>
> . . . .
>
> Listen, this man was charged in September of 1996. The evidence was he was charged in September of 1996.
>
> His wife said that they were aware from Derrick that next day that this is, that this child had witnessed this, this injury. But from September of 1996 until she testified, no one told the police anything about this. No one told anybody about Derrick.
>
> Now, I am charged with a crime, I am charged with murdering somebody, and I have a witness who can testify that this is

> how it happened, I want that witness to get down to the police immediately, not wait a year and a half and hide him. Why hide it?
>
> It's to coverup. Why would anyone, when anybody says, this man is not guilty, somebody back there say, why in the world didn't he tell the police this in August? Why did he wait until June of 1997 for the first time to tell them?
>
> It is not reasonable and that is what jury trials are all about.

The prosecutor continued, but was subsequently interrupted by defense objection. Counsel approached the bench and it was established that, unbeknownst to the prosecutor, defense counsel informed the prosecutor's co-counsel, in December of 1996, that Derrick claimed to have seen Tristan strike his head on the coffee table. Furthermore, the defense had submitted to the prosecutor's office three videocassette tapes of Derrick's interview with defense counsel regarding the incident.

Counsel, as well as the judge, agreed that the prosecutor's misstatement in his closing argument was unintentional and inadvertent. However, they also agreed that the misstatement created a "serious" problem that needed to be remedied. As a result, the judge asked defense counsel what relief they were asking for. The defense counsel first asked that the state or the court "make a comment acknowledging that the state knew as early as mid-December that Derrick had been discovered." Defense counsel again confirmed that this statement was the relief he was requesting.

After some further discussion, the prosecutor directly asked defense counsel if he wanted a mistrial. The response was "No, I don't want a mistrial." The court then reiterated the serious nature of the mistake, and again asked defense counsel if he wanted a mistrial. He again replied no, and the court ruled that it was not going to declare a mistrial because it had not been asked to do so. After conferring with his co-counsel outside the courtroom, defense counsel indicated that he was requesting "a nice, strong curative statement by the court ... we are not going to ask for a mistrial." Defense counsel reit-

erated, for the sixth time, that he did not want a mistrial, and asserted that he had decided that he would like a curative statement by the prosecutor, instead of the court. Consequently, the prosecutor addressed the jury:

Ladies and gentleman of the jury, it's critically important that you understand what happened here.

Unbeknownst to me, and everybody's here to find the truth and that's all everybody's interested in, and you all must be properly told the whole truth in order for you to reach your decision. In December of ... '96, the defense attorney gave the name of Derrick ... to [the prosecutor's co-counsel].

And he also, unbeknownst to me, sent a videotaped statement of Derrick to [the prosecutor's co-counsel].

Does everybody understand that? Does everybody understand?

It's critically important that you decide this case on the truth and only the truth.

Like I said, I wouldn't intentionally in any way attempt to misrepresent anything. Does everybody understand?

Okay.

Everyone's here just to find the truth.

The defense attorney did not ask for anything further, apparently satisfied with the statement, and let the prosecutor continue with the state's closing arguments. The defendant now appeals, claiming that the trial court should have, *sua sponte*, declared a mistrial.

Although improper comments by the prosecutor may rise to the level of *sua sponte* action by the trial court, *see State v. Roberts*, 838 S.W.2d 126, 131 (Mo.App.1992), the remedy granted in this case was the exact relief requested by defense counsel. In *State v. Hendrix*, this court considered this question, and stated that:

The declaration of a mistrial is a drastic remedy that is to be exercised only in extraordinary circumstances.... If the drastic remedy of a mistrial is warranted, it is the responsibility of counsel to request that relief.... Where no such request is made, it is assumed that counsel is satis-

fied that the corrective action taken by the court is adequate. *Subsequent complaint that additional corrective measures were needed comes too late.*

883 S.W.2d 935, 945 (Mo.App.1994) (citing *State v. Feltrop*, 803 S.W.2d 1, 9 (Mo. banc 1991); *State v. Mabry*, 602 S.W.2d 1, 2 (Mo. App.1980)). (Emphasis added). "Thus, appellant's claim is not preserved for review on appeal because appellant was granted the relief he sought." *Hendrix*, 883 S.W.2d at 945 (citing *Mabry*, 602 S.W.2d at 2; *State v. Harvey*, 766 S.W.2d 175, 177 (Mo.App.1989)).

As the Missouri Supreme Court has stated, in *State v. White*, "[t]he defendant cannot complain about the denial of a mistrial when his counsel plainly told the court that he did not want this relief." 813 S.W.2d 862, 866 (Mo. banc 1991). Point denied.

The judgment of the trial court is affirmed.

ELLIS and RIEDERER, JJ., concur.