**STATE of Missouri, Respondent,**

v.

**Rose Marie GUNN, Appellant.**

**No. WD 59126.**

Missouri Court of Appeals,
Western District.

Submitted Aug. 13, 2001.

Decided Oct. 2, 2001.

Irene C. Karns, Asst. Public Defender, Jefferson City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for Respondent.

Before THOMAS H. NEWTON, P.J., HAROLD L. LOWENSTEIN, and JAMES M. SMART, JR., JJ.

JAMES M. SMART, JR., Judge.

Rose Gunn was convicted by a Boone County jury on July 26, 2000, on one count of the class D felony of endangering the welfare of a child in the first degree, in violation of § 568.045, RSMo 1994. On September 25, 2000, Gunn was sentenced by the court as a persistent misdemeanor offender to four years' imprisonment with the Missouri Department of Corrections. The defendant appeals her conviction to this court. We affirm the conviction.

## Factual Background

Viewed in the light most favorable to the verdict (*State v. Clay*, 975 S.W.2d 121, 139 (Mo. banc 1998)), the following evidence was adduced at trial. At around 11:00 a.m., on June 1, 1999, Rose Gunn called 911 to report that Jacob Caldwell, one of the children she was caring for at her in-home, state-licensed daycare center, had fallen and was non-responsive. Gunn then called the child's mother, Carrissa Jacobs, at work and told her the child "rolled off the couch and wasn't responding." Ms. Jacobs left work and rushed to Gunn's home, arriving in time to observe the emergency medical workers attending to her two and one-half month old son, Jacob, who was non-responsive, lying on the floor with his arms up above his head. Ms. Jacobs also testified that Jacob's eyes were "rolled back and ... fluttering," and that he "had a bruise on his left cheek, and ... a really fat lip ... and he also had blood in his mouth and dry blood around his nose." Gunn told Ms. Jacobs at that point that "she was changing him and he rolled off the couch."

Shortly after regaining consciousness, Jacob was put into the ambulance to be transported to Boone Hospital. As Ms. Jacobs rode along in the ambulance with Jacob, she heard him "screaming in a way [she had] never heard him scream before." Ms. Jacobs called Jacob's father at work, who met them when they arrived at the hospital.

After arriving at the emergency room, Jacob was first examined by Dr. Kristin Malaker. Dr. Malaker observed that Jacob was suffering from a bulging fontanel (commonly known as the "soft spot"); that his pupils were unequally dilated, indicating neurological dysfunction; and that he had abrasions on his upper and lower lips and on the top of his tongue, suggesting "traumatic injury." Suspecting child abuse, Dr. Malaker reported the matter.

Detective John Short was assigned to the case. He interviewed Jacob's mother and his doctors, and reviewed the tran-

script of Gunn's 911 call. The detective first spoke with Gunn at her home, but eventually took her to the police station. Gunn was advised of her *Miranda* rights on the way to the police station, and she signed a waiver of those rights at the station. After she waived her rights, the detective told Gunn that the doctors contradicted her account of the incident by stating the injuries were not consistent with a roll off a couch and that a child of Jacob's age is not capable of rolling himself off a couch. Gunn then offered that Jacob had kicked himself off the couch as she was feeding him. The detective reminded Gunn that in her 911 call, she stated that he rolled off the couch as she was changing his diaper. At that point, Gunn told the detective that Jacob had been fussy earlier and that she had "bounced him on her knees," "held him out and turned him in half circle motions from side to side" and "rocked the child back and forth" in an effort to calm him. The detective then moved Gunn to another room, asked her to repeat her recollection about what had happened, and secretly taped her as she did so. When Gunn had finished, she was arrested and charged with child endangerment, pursuant to § 568.045.

At Gunn's trial, testimony was heard from the three doctors who treated Jacob and from one doctor who was testifying as an expert on child abuse and neglect, specifically on "shaken baby syndrome." Testimony was also heard from Detective Short, who arrested and interrogated Gunn; from a worker with the Missouri Department of Health, Bureau of Child Care, which had licensed Gunn's daycare center; and from Gunn herself. Each doctor who took the stand (Dr. Malaker, the emergency room physician; Dr. Bondurant, the neurosurgeon; Dr. Blair, the ophthalmologist; and Dr. Frasier, the child abuse expert), testified that the history provided by Gunn was not consistent with the injuries observed in Jacob Caldwell. Each doctor also testified that the injuries were recent, but could not give an exact time for the injuries.

All the doctors agreed that the injuries were not consistent with the story given by Gunn; that the injuries were the result of Jacob having been violently shaken; and that the injuries had occurred recently. Two of the doctors, Dr. Bondurant and Dr. Frasier, testified that the injuries occurred simultaneously to the child becoming unconscious and non-responsive. Dr. Frasier testified that retinal hemorrhage and subdural hematoma are classic injuries associated with a baby who has been violently shaken. Dr. Blair testified that he was one hundred percent certain that the retinal hemorrhages were caused by shaking. Dr. Bondurant stated that Jacob's injuries were non-accidental trauma and were not consistent with a fall from a couch but were consistent with shaking. Dr. Bondurant testified that an eighteen-inch fall from a couch was a trivial event that would not render a child unconscious and non-responsive.

Dr. Bondurant testified, additionally, that because subdural hematoma injuries are not "time stamped," the "history becomes imperative in pinpointing when it was inflicted." Dr. Bondurant stated that it is not the subdural hematoma that causes the child to become unresponsive; rather, it is the event that causes the subdural hematoma which causes the unresponsiveness, and that as soon as that event takes place, the baby is unresponsive. Dr. Frasier, also, testified emphatically that Jacob's injuries were sustained at the same time that he became unconscious: "Q [by the prosecutor]: So at the point Jacob Caldwell became nonresponsive, that is the time that the shaking occurred? A [Dr. Frasier]: Yes."

Howard Keen, a child care supervisor with the Department of Health, Bureau of Child Care, testified that, since Gunn was licensed, she would have received a booklet of rules and regulations that specifically prohibits child care providers from using corporal punishment and specifically prohibits shaking. He further discussed other materials Gunn would have received as a licensed provider, which discussed "Shaken Baby Syndrome" and which would have put her on notice that shaking was a prohibited form of punishment. When Rose Gunn took the stand in her own defense and the prosecutor asked her whether she "knew all the risks associated with shaking a baby," she answered "yes," she did.

Rose Gunn was convicted by the jury on the charge of child endangerment and sentenced to four years' imprisonment. She appeals now to this court, basing her appeal on the contention that the State presented insufficient evidence from which a reasonable juror could have found beyond a reasonable doubt that Gunn shook Jacob Caldwell.

### Standard of Review:

■■■ When an appeal challenges the sufficiency of the evidence, this court accepts as true all evidence favorable to the verdict, including all favorable inferences drawn therefrom, and disregards all evidence and inferences to the contrary. *State v. Grim,* 854 S.W.2d 403, 405 (Mo. banc 1993). Our review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt and

whether a reasonable juror could find each of the elements beyond a reasonable doubt. *Clay,* 975 S.W.2d at 139. "These principles apply whether the evidence is direct or circumstantial." *State v. Gaver,* 944 S.W.2d 273, 277 (Mo.App.1997).

■■■ "Weighing the evidence to determine whether the defendant was guilty beyond a reasonable doubt is the role of the jury and not the function of the reviewing court." *State v. Simpson,* 718 S.W.2d 143, 146 (Mo.App.1986) (citations omitted). Credibility and weight of testimony are matters for the jury to determine, and a jury may believe all, some or none of the testimony of a witness. *State v. Mishler,* 908 S.W.2d 888, 893 (Mo.App. 1995). Furthermore, the jury is entitled to accept the State's evidence as true, and reject the defendant's testimony as false. *Id.*

### Sufficiency of the Evidence:

■■■ In her sole point on appeal, Gunn contends that the trial court erred in denying her motion for acquittal at the close of all the evidence because the State presented insufficient evidence from which a reasonable juror could have found beyond a reasonable doubt that Rose Gunn shook Jacob Caldwell. The statute under which Gunn was charged and convicted states:

**§ 568.045. Endangering the welfare of a child, in the first degree**

1. A person commits the crime of endangering the welfare of a child in the first degree if:

   (1) The *person knowingly*[1] *acts* in a manner that creates a substantial risk

---

1. Knowingly is defined in § 562.016:
   3. A person *"acts knowingly"*, or with knowledge,
   (1) With respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist; or
   (2) With respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result.

to the life, body, or health of a child less than seventeen years old....

(emphasis added).

Gunn points out that the State must prove each element of the offense beyond a reasonable doubt, pursuant to the United Supreme Court's ruling in *In re Winship*, 397 U.S. 358, 363–64, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The relevant elements of this offense which must be proved are: (1) the act itself; (2) the perpetrator of the act; and (3) knowledge.[2] Gunn contends that the evidence failed to support the conviction for child endangerment because the State did not prove that she was the perpetrator of the act, *i.e.*, the person who shook Jacob, thereby causing his injuries. Gunn asserts that the evidence did not show that she shook Jacob;

rather, it showed only that a shaking had occurred and that she had the opportunity to do so. Gunn argues that this does not satisfy the State's burden of proof.[3]

Gunn points out that, while all the doctors attributed Jacob's injuries to violent shaking, none of the doctors testified that the shaking had to have occurred just before Jacob was taken to the hospital, in other words, while he was in Gunn's care. She observes that Dr. Bondurant testified that the event causing the hematoma could have happened as long as two weeks before Jacob was brought to the hospital;[4] that Dr. Blair thought the shaking could have happened as long as three days before;[5] and that even Dr. Frasier admitted that the shaking could have occurred within a week before Jacob came to the hospital.[6] Gunn concludes: "In light of the

2. Gunn does not dispute that the evidence was sufficient to prove: (1) (the act) that the child's injuries were caused by violent shaking, and (2) (knowledge) that Gunn knew that violently shaking a baby can cause "substantial risk to the life, body, or health of a child."

3. See *State v. Castaldi*, 386 S.W.2d 392, 395 (Mo.1965), in which the court, in reversing the defendant's conviction on the basis of insufficient evidence, noted: "Evidence that an accused had an opportunity to commit a crime, or which merely raises a suspicion and gives rise to conjecture, is insufficient as the basis for a judgment of conviction."

4. Dr. Bondurant testified on direct examination:

Q. Within a reasonable degree of medical certainty, Doctor, are you able to give exact time that an injury such as a[n] ... acute subdural hematoma would have been inflicted?

A. Well, exact, not necessarily. But I can give a range.

Q. Based on the CT scan ... within a reasonable degree of medical certainty, what would the range be for that particular injury?

A. In between seconds and approximately a week or two.

Q. Any way to narrow it down any more than that ... ?

A. Well, with the significant density ... that would, in theory, tend to place it more toward the shorter end of that time spectrum.....

5. Dr. Blair testified on direct examination:

Q. And are you able to determine, within a reasonable degree of medical certainty, Doctor, the exact time in which these hemorrhages were inflicted or occurred?

A. On a relative basis, in the sense of days. .... It's not possible for me to put it in a time frame of hours.

Q. Are you talking about their appearance occurring no longer than a couple of days from that time?.... Is there a range of time that you can narrow that to?

A. Within two or three days would be reasonable.

Q. Okay. Three being the most?

A. Most, right.

6. Dr. Frasier testified on cross-examination:

A. I don't believe [the injury] would be, based on my review of the CT scan, could be any older than about a week, based on purely looking at the CT scan.

Q. So within that range, you would say a week?

A. Yes.

testimony from three different doctors that the shaking could have occurred when Jacob was not in Ms. Gunn's care, the State failed to meet its burden of proof in this case." She states that for this reason, this court must reverse her conviction.

In response to Gunn's arguments, the State correctly points out that the evidence established (1) that Jacob was healthy and normal when his mother gave him to Gunn to care for; (2) that Gunn alone was responsible for Jacob at the time he became unconscious; and (3) that he had to be rushed to the hospital for injuries associated with "shaken baby syndrome" after being in her unsupervised care. In reply to Gunn's argument that three doctors testified the shaking could have occurred while Jacob was *not* in Gunn's care and that none of the doctors testified the shaking had to have occurred while the baby was in her care, both Drs. Bondurant and Frasier testified that Jacob's loss of responsiveness would have occurred at the time of the injury.

Dr. Bondurant concurred with Dr. Malaker that the child could not possibly have rolled off the couch, and agreed that for a child to fall from a couch to a carpeted floor would be considered "a trivial trauma" that would not create any significant injury. Dr. Bondurant was then questioned by the prosecutor about his thoughts on the "timing" of the incident:

Q.[by the prosecutor]: Would the existence of that subdural hematoma cause the infant to become unresponsive, the existence of that subdural, based on the history that you received?

* * *

A.[Dr. Bondurant]: Well, the subdural that I saw on the CAT scan and the state that I saw the child in as being responsive would suggest that the subdural was insufficient to make the child unresponsive in and of itself. . . .

Q. Okay. So in other words, it's not the actual subdural that would make the child unresponsive as much as the event that caused it? Is that a fair statement?

A. That is a fair statement.

* * *

Dr. Lori Frasier, assistant professor of child health at the University of Missouri–Columbia, who testified as an expert witness on child abuse and neglect, was also questioned as to the timing of the injury. She testified:

Q.[by the prosecutor]: In reviewing the medical information, Dr. Frasier, are you able to determine a time frame when these injuries would have been sustained to Jacob?

A.[Dr. Frasier]: They would have occurred when Jacob was rendered unconscious.

Q. And why is that?

A. Well, really, the injury that occurs during shaking is a subdural. But that's only a marker for what's going on inside the brain. . . . . [T]he fact that he had these injuries shows that he was shaken. The fact that he was unconscious, that shows when this happened.

Q. So at the point Jacob Caldwell became nonresponsive, that is the time that the shaking occurred?

A. Yes.

* * *

The State concludes that, based on this medical testimony that Jacob was shaken when he slipped into unconsciousness, and based on the evidence that he became unconscious in appellant's care, a reasonable juror could conclude that it was the appellant who was responsible for shaking Jacob, thereby creating his injuries. We agree. In *State v. Yoksh*, 989 S.W.2d 227 (Mo.App.1999), Mrs. Yoksh, who operated a day care, left the day-care children in the

care of her husband. *Id.* at 228. When the mother of a baby arrived to pick the baby up, he was non-responsive and his breathing was labored. *Id.* at 229. The child was rushed to the hospital, but died from his extensive injuries, which included subdural and retinal hemorrhages. *Id.* at 230.

The similarities in *Yoksh* to this case are evident:

> The medical examiner testified that the nature of [the child]'s injuries indicated a non-accidental cause. All of the state's experts were of the opinion that the injuries that [the child] received could not have occurred from him simply falling off the couch onto a coffee table. In fact, the defendant's own expert testified that this was highly unlikely. Moreover, the state's medical evidence that [the child] was shaken, as indicated by the hemorrhages in his retinas, was not adequately countered by the defendant.

*Id.* at 233.

In *Yoksh,* the circumstantial evidence included the following: (1) the defendant was the only adult in the house when the child received his injuries; (2) the child's crying irritated him; (3) the child was acting normally, and appeared to be healthy, before the defendant was alone with him. *Id.* Finally, in *Yoksh,* as in the case at hand, there were conflicting statements made to the police right after the incident occurred. *Id.* The court opined that those conflicting statements also "undermines the defendant's version of the events." *Id.*

In the case at hand, as in *Yoksh,* the record established that Gunn was left alone with a previously healthy baby who fell unconscious in her care and then required treatment for "shaken baby" injuries. Furthermore, in this case, evidence was presented which showed that the inju-

ry occurred at the same time that the baby lost consciousness. Thus, there was sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt, in that a reasonable juror could have found each of the elements of the offense beyond a reasonable doubt. Gunn's point is therefore denied.

## Conclusion

For the foregoing reasons, Gunn's conviction and sentence are affirmed.

NEWTON and LOWENSTEIN, JJ., concur.