

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | |
| **Respondent,** | ) | **WD78464** |
| | ) | |
| **v.** | ) | **OPINION FILED:** |
| | ) | **November 22, 2016** |
| **SHELLEY A. RICHTER,** | ) | |
| | ) | |
| **Appellant.** | ) | |

**Appeal from the Circuit Court of Cole County, Missouri**
The Honorable Patricia S. Joyce, Judge

Before Division Four: Mark D. Pfeiffer, Chief Judge, Presiding, Karen King Mitchell, Judge and Gary D. Witt, Judge

Appellant Shelley Richter ("Richter") appeals her conviction of endangering the welfare of a child in the first degree, section 568.045.[1] Following a jury trial, she was convicted and sentenced to five years' imprisonment by the Circuit Court of Cole County. On appeal, Richter alleges that the circuit court erred in denying Richter's motion for judgment of acquittal at the close of State's evidence because there was insufficient evidence to support her conviction. Further, she claims that the court erred in submitting

---

[1] All statutory citations are to RSMo 2000 as currently updated, unless otherwise noted.

"disjunctive acts" in the verdict director, giving the jury a "roving commission."  We affirm Richter's conviction.

## Factual and Procedural Background[2]

The victim, L.S., was born in January, 2010, a month premature.  However, he was thriving and, at his six-month wellness visit, he met all expected milestones.  Other than a hospitalization in March 2010 for a respiratory virus and other common childhood illnesses, he was a healthy baby.  There was no evidence that L.S. had suffered any significant injuries.

When L.S. was about ten-weeks-old, he was placed in the care of Richter, who ran a licensed child daycare from her home.  On August 19, 2010, L.S.'s mother ("Mother") took him to daycare.  She testified that he was alert and active when she dropped him off at approximately 9:00 a.m.

According to Richter's statements to police, shortly before 12:30 p.m. Richter picked up L.S. out of a walker in order to feed him lunch.  As she picked him up, she was in the process of bringing him to her side and stepping backwards when another child came up behind her and caused her to lose her balance.  Richter fell to the floor and, as she did, she lost her grasp of L.S. who fell onto the floor.  The floor was concrete covered with linoleum.  Richter said that she went to L.S., and that L.S. was on his right side and crying.  She picked him up, and L.S. stopped moving.  She attempted to rouse him by blowing in his face but L.S.'s head went limp and she believed he had broken his neck.  Richter called

---

[2] On appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict.  *State v. Peal*, 393 S.W.3d 621, 623 n.1 (Mo. App. W.D. 2013).

her neighbor, Dawn Wilde, who worked from home and was the mother of another child. Wilde came immediately and instructed Richter to call 911. Wilde called Mother instructing her to come to the daycare.

At approximately 12:30 p.m., Mother received a phone call from Wilde reporting that there had been an accident with L.S., an ambulance was on the way, and Mother should come immediately. When Mother arrived, L.S. was lying on the floor in the back of the daycare. He was pale, his eyes were barely open, he was making odd squeaking and moaning sounds, having trouble breathing, and was moving his arms in a circular pattern. When the ambulance arrived about 20 minutes later, L.S. was placed on a backboard and transported to the local emergency room at Capital Regional Hospital in Jefferson City. Emergency room personnel immediately called for a life flight transport to take L.S. to University Hospital in Columbia, Missouri. L.S. was in serious condition with bleeding in his brain, hemorrhaging in both eyes, and the lowest possible score on the Glasgow coma scale. He was intubated to help him breath.

Both Mother and L.S.'s father ("Father") drove to University Hospital from Jefferson City. Dr. Craig Downs ("Dr. Downs") treated L.S. in the University Hospital Emergency Room. Dr. Downs disagreed with the "initial history" he had received, opining that the type of injuries that L.S. was suffering were "not at all compatible" with the fall as described. Dr. Downs believed the injuries were caused by "abusive head trauma" that occurred "very recent" to L.S.'s arrival at the hospital. L.S. was admitted to the Pediatric Intensive Care Unit.

3

The next day, L.S. was seen by Dr. Nitin Patel ("Dr. Patel"), a pediatric neurologist. Dr. Patel testified that L.S. had slowed brain activity, especially on the left side. A MRI scan showed a lack of blood supply to the brain that would have happened within three days prior to the scan. L.S. also had intracranial bleeding and optic nerve swelling. Dr. Patel believed that L.S. "must have suffered what is called a shaken baby syndrome or non-accidental head trauma."

Dr. Joseph Giangiacomo ("Dr. Giangiacomo"), a pediatric ophthalmologist, also examined L.S. finding that L.S. had bilateral hemorrhages in his eyes as well as an extensive amount of blood in his eyes that ultimately necessitated surgery. Further, it was Dr. Giangiacomo's opinion that the injuries were not caused by an accident.[3]

As a result of his injuries, L.S. developed Cerebral Palsy, is developmentally delayed, is "more or less blind," and will require assistance for the remainder of his life.

The jury found Richter guilty of endangering the welfare of a child. The court sentenced her to five years' imprisonment. This appeal followed.

---

[3] Dr. Giangiacomo was deceased at the time of trial. His deposition testimony was played to the jury and admitted into evidence. His testimony is cited by and relied on by both parties; however, his deposition was not provided to this Court on appeal. As such, we are limited to reviewing his diagnoses and opinions as they were testified to by other witnesses. "Rule 81.12 imposes a duty on appellants to file a legal file with all records necessary for review. We are entitled to presume that omitted portions of the record are unfavorable to the appellant and favorable to the trial court's decision." *Long v. State,* 441 S.W.3d 154, 159 n.6 (Mo. App. E.D. 2014) (internal citations omitted).

4

## Discussion

## I.

Richter's first point on appeal alleges that there was insufficient evidence upon which a reasonable juror could have found her guilty of endangering the welfare of a child in the first degree.

### Standard of Review

"This Court's review is limited to determining whether there was sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Letica,* 356 S.W.3d 157, 166 (Mo. banc 2011). "The evidence and all reasonable inferences therefrom are viewed in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict." *State v. Belton,* 153 S.W.3d 307, 309 (Mo. banc 2005). "This is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt." *State v. Nash,* 339 S.W.3d 500, 509 (Mo. banc 2011) (internal quotations and citations omitted). When reviewing the sufficiency of evidence supporting a criminal conviction, the Court does not act as a 'super juror' with veto powers. *State v. Grim,* 854 S.W.2d 403, 414 (Mo. banc 1993). In such cases, this Court gives great deference to the trier of fact. *Id.*

*State v. Miller*, 372 S.W.3d 455, 463 (Mo. banc 2012).

### Analysis

Richter's first point on appeal alleges that there was insufficient evidence upon which a reasonable juror could have found her guilty of endangering the welfare of a child in the first degree. "A person commits the crime of endangering the welfare of a child in the first degree if: (1) The person knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years old . . . ." Section 568.045.1.

5

Richter contends that the State failed to prove any of these elements because it only put before the jurors "suspicions" rather than proof of facts. Richter admits that the treating physicians all testified that L.S. suffered from "shaken baby syndrome" or "abusive head trauma" immediately before being taken to Capital Regional Hospital but that "saying it, however, does not make it so." While certainly that may be true, the jury was free to believe the diagnosis and medical opinions offered by multiple treating physicians who were qualified as experts.

As outlined above, all of the physicians who initially treated L.S. opined that his injuries were the result of abusive head trauma, often referred to as "shaken baby syndrome." Dr. Downs testified that he believed the injury was caused just prior to L.S. being brought to the hospital. The State also presented the testimony of Dr. Douglas Beal ("Dr. Beal") who reviewed L.S.'s medical records, including records of his care and treatment before the August 19 injury. Dr. Beal also testified that to a reasonable degree of medical certainty, L.S.'s injuries were caused by "abusive head trauma," and that the "mechanism [was] a shaking and impact, a violent shaking where there's acceleration forces forward followed by rapid deceleration forces, the same back . . . . I believe that [L.S] was probably thrown forcibly -- hit forcibly against something that was soft like a cushion on a couch or a mattress or a pillow." Further, Dr. Beal testified that the injury to L.S. "occurred within seconds to minutes before he was found unresponsive."

6

Richter highlights to this Court evidence presented at trial that Richter may not have intentionally injured L.S. Dr. Giangiacomo's deposition[4] testimony was that he could not diagnose retinoschisis, a condition often present in children that have been shaken. Dr. Giangiacomo also testified that the rapid growth of L.S.'s head--from the 25th percentile at one month old to the 97th at his sixth month exam--would be of concern to him, leading to the defense's conclusion that L.S. had a preexisting condition. Richter also points to the testimony of defense expert Dr. John Plunkett, that "there might have been a preexisting congenital disorder which caused the subdural hemorrhaging." Further, defense experts submitted evidence showing that L.S. may have had hemorrhaging that was chronic and had begun as much as 14 days before L.S. was taken to the hospital. This argument ignores our standard of review. The jury was free to discount this medical testimony and find that the testimony of the treating physicians and their opinions regarding when the injury occurred was more persuasive.

The jury's decision to believe the medical evidence presented by the State and find the defense witnesses less credible was not error. This Court cannot act as a super juror and reweight the evidence. *Grim,* 854 S.W.2d at 414. We are prohibited from deciding that the evidence cited by Richter in both her Opening Brief and Reply Brief should have been more persuasive to jurors. Cases often present difficult decisions for jurors where there is both evidence of guilt and innocence. This Court is only charged with determining whether there was "sufficient" evidence upon which a reasonable juror could have found

---

[4] As noted above, Dr. Giangiacomo's deposition testimony was not provided to this court on appeal. *Ex gracia* we note the evidence as cited by Richter.

7

Richter guilty. *Nash,* 339 S.W.3d at 509. In this case, there was ample testimony from three treating physicians and the State's expert that all agreed that L.S. had been shaken and that the trauma had occurred immediately prior to L.S. being taken to Capital Regional Hospital. All three physicians testified that the injuries could not have been caused by the events as described by Richter. The jury was free to find that this testimony was more credible than the testimony of the defense experts. *State v. Crawford*, 68 S.W.3d 406, 408 (Mo. banc 2002) (a jury is entitled to believe "all, some, or none" of the testimony of witnesses).

The State was required to prove that: (1) L.S., being less than seventeen, was put in a substantial risk to his life, body, or health; (2) Richter was the one who put him at risk; and (3) Richter acted knowingly. *See* section 568.045.1(1). The physicians testifying for the State all testified that, in their professional opinion, the injuries to L.S. were not accidental and were caused by an intentional shaking or striking and that the injury occurred shortly before L.S. was transported to the hospital. By her own testimony, Richter was the only person present immediately prior to L.S.'s injury. While there was not direct evidence that Richter struck or shook L.S., the fact that L.S. had injuries consistent with such an event, the injuries were caused immediately before L.S. was taken to the hospital, and that Richter was the only person present during that time frame, together result in sufficient circumstantial evidence that Richter knowingly injured L.S. "There is no distinction between direct and circumstantial evidence, and therefore, a court should not overrule a fact-finder 'simply because the cause depended . . . upon circumstantial proof.'" *State v. Curtis*, 2016 WL 4527178, *2 (Mo. App. E.D. Aug. 30, 2016).

In support of her argument, Richter relies on *State v. Gunn*, 57 S.W.3d 347 (Mo. App. W.D. 2001) in which this Court affirmed a mother's conviction for endangering the welfare of a child, finding sufficient evidence to show that the mother caused the death of her child by violently shaking him. In *Gunn*, this Court found sufficient evidence to convict mother where medical experts testified that the injury was caused by shaking and the injury would have occurred at the same time the child became unresponsive. *Id.* at 352. Richter attempts to argue that *Gunn* is "vastly different" because in this case the testimony "left grave doubt about the cause and timing of L.S.'s injuries." We disagree. As discussed above, there was sufficient evidence upon which a reasonable jury could decide that Richter intentionally struck or shook L.S., causing him injury, and such an action occurred immediately prior to L.S. becoming unresponsive and being transported to the hospital. Thus, just as with *Gunn*, there was sufficient evidence to support conviction.

We cannot and will not overturn the verdict of the jury simply because the defendant believes the jury should have found her evidence more persuasive. The first point is denied.

## II.

Richter's second point on appeal alleges that the circuit court erred in giving to the jury a verdict director that allowed "disjunctive acts" to be considered, resulting in a "roving commission." Specifically, Richter alleges that by instructing the jury that they could find either that Richter "struck or shook" L.S., the jurors did not have to come to a unanimous decision as to how Richter was guilty pursuant to section 568.045.1.

9

## Standard of Review

When reviewing claims of instructional error, this Court will reverse the circuit court's decision only if the instructional error misled the jury and, thereby, prejudiced the defendant. *Nash,* 339 S.W.3d at 511. "[R]eversal is only warranted when the instructional error is so prejudicial that it deprived the defendant of a fair trial." *Id.* at 511–12 (quoting *State v. Anderson,* 306 S.W.3d 529, 534 (Mo. banc 2010)). Prejudice occurs when an erroneous instruction may have influenced the jury adversely. *State v. Belton,* 153 S.W.3d 307, 310 (Mo. banc 2005). However, there is no prejudice if an instruction is an accurate statement of law and supported by the evidence. *State v. Avery,* 275 S.W.3d 231, 233 (Mo. banc 2009).

*State v. Zetina-Torres*, 482 S.W.3d 801, 810 (Mo. banc 2016).

Under Missouri law, "when a crime may be committed by any of several methods, the information (or indictment) must charge one or more of the methods, and the method or methods submitted in the verdict directing instruction must be among those alleged in the information, and when submitted in the disjunctive each must be supported by evidence." *State v. Lusk*, 452 S.W.2d 219, 223 (Mo. 1970). The indictment charging Richter clearly identifies both striking and shaking L.S. as causing his injuries, and the State presented expert medical testimony from multiple witnesses that L.S.'s injuries were caused by striking or shaking and not from a fall as described. Thus, the general requirements of *Lusk* were met. We now must determine whether instructing in the disjunctive was proper, given the requirement that there be jury unanimity. *State v. Marks*, 721 S.W.2d 51, 54 (Mo. App. W.D. 1986).

The United States Supreme Court has found there are two key considerations in determining whether to allow jury instructions in the disjunctive:

The first of these considerations increases the likelihood that treating violations simply as alternative means, by permitting a jury to avoid

10

discussion of the specific factual details of each violation, will cover up wide disagreement among the jurors about just what the defendant did, or did not, do. The second consideration significantly aggravates the risk (present at least to a small degree whenever multiple means are at issue) that jurors, unless required to focus upon specific factual detail, will fail to do so, simply concluding from testimony, say, of bad reputation, that where there is smoke there must be fire.

*Richardson v. U.S.*, 526 U.S. 813, 819 (1999). A "jury need only be unanimous as to the ultimate issue of guilt or innocence, and need not be unanimous as to the means by which the crime was committed." *State v. Fitzpatrick*, 193 S.W.3d 280, 292 (Mo. App. W.D. 2006). "A disjunctive submission of alternative means by which a single crime is committed is proper if both alternatives are supported by sufficient evidence and the alternative means are in the same "conceptual grouping." *Id.* In *Richardson*, the United States Supreme Court provided an example of an allowable disjunctive.

> Where, for example, an element of robbery is force or the threat of force, some jurors might conclude that the defendant used a knife to create the threat; others might conclude he used a gun. But that disagreement--a disagreement about means--would not matter as long as all 12 jurors unanimous concluded that the Government had proved the necessary related element, namely, that the defendant had threatened force.

*Richardson*, 526 U.S. at 817; *see also U.S. v. Rice*, 699 F.3d 1043, 1048 (8th Cir. 2012) ("In fraud cases jurors need not agree on 'the precise manner in which the scheme violated the law,' only the 'general thrust' of the scheme."). This case is similar to the example used in *Richardson*.[5] The jury in this case was still forced to consider the detailed medical

---

[5] *Richardson* itself found that, in the context of a continuing criminal enterprise, the jury needed to agree unanimously on which of the several acts were part of the charged offence since the statute made each violation in the underlying series an element of the offense. *Richardson*, 526 U.S. at 815. Such is not the case here where the jury could find all necessary elements of the crime were proven without determining the specific means by which L.S. was injured. Similarly, Richter's reliance on *State v. Celis-Garcia*, 344 S.W.3d 150 (Mo. banc 2011) is misplaced. *Celis-Garcia* involved allegations of multiple acts of sodomy occurring at different times and at

11

testimony to determine whether L.S.'s injuries were caused by an accidental fall or by an intentional act. Nor did this case pose a risk that the jury would convict Richter just on a reputation as a bad actor. The jurors necessarily reached a unanimous decision that Richter knowingly put L.S. at substantial risk to L.S.'s life, body or health. However, the means by which Richter put L.S. at risk--either by shaking or by striking--is unclear. It did not destroy jury unanimity to offer the jury an instruction in the disjunctive as to means.

The circuit court did not err in instructing the jury that they could find Richter guilty of endangering the welfare of a child either by shaking or striking L.S. The second point is denied.

## Conclusion

The circuit court did not err in finding the State presented sufficient evidence upon which a reasonable juror could find Richter guilty of endangering the welfare of a child in the first degree. Further, we find that the court did not err in instructing the jury in the disjunctive. For the reasons stated above, we affirm.

_____
Gary D. Witt, Judge

All concur

---

different locations. *Id.* at 154. The Missouri Supreme Court found instruction in the disjunctive was improper because the jury did not have to agree as to which act or acts of sodomy took place. *Id.* at 155-58. In this case, the State only alleged that Richter injured L.S. one time and the disjunctive was limited to the means by which that particular injury took place. The jury was still required to reach unanimity on all the elements of the crime charged.

12