Stacy, Michael & Amber KOONTZ, Appellants,

v.

Alan FERBER, M.D., Research Medical Center, William Braun, M.D., Respondents,

Children's Mercy Hospital, Defendant.

No. WD 46357.

Missouri Court of Appeals, Western District.

Dec. 28, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 1, 1994.

Application to Transfer Denied March 22, 1994.

David T. Greis, William H. Pickett, P.C., Kansas City, for appellants.

Timothy M. Aylward, Blackwell Sanders Matheny Weary & Lombardi, Kansas City, for respondent Alan Ferber, M.D.

Thomas G. Kokoruda, Shughart, Thomson & Kilroy, Kansas City, for respondent Research Medical Center.

B.W. Jacob, Bagby & Jacob, Kansas City, for respondent William Braun, M.D.

Stephen S. Brown, Niewald Waldeck & Brown, Kansas City, for defendant Children's Mercy Hosp.

Before ULRICH, P.J., and BERREY and SMART, JJ.

SMART, Judge.

Amber Koontz was born at Research Medical Center with permanent and severe neurological damage. Her parents and Amber brought an action against Dr. Alan Ferber, Dr. William Braun, Research Medical Center and Children's Mercy Hospital, claiming negligence in the delivery of the child. After a jury verdict in favor of defendants, the plaintiffs now appeal.

Judgment is affirmed.

On August 29, 1980, Mr. and Mrs. Koontz arrived at Research Medical Center ("Research") anticipating the birth of their child. Prior to 1:50 a.m., on August 30, Mrs. Koontz' labor was progressing normally. At 1:50 a.m., Mrs. Koontz' blood pressure became elevated, and after remaining elevated for approximately ten minutes, the attending nurse notified Dr. Ferber, the obstetrician. Dr. Ferber was concerned about a condition that can develop in expectant mothers known as "pre-eclampsia." This condition can lead to "eclampsia," in which the mother suffers seizures which endanger both the mother's life and the child's life. The symptoms of pre-eclampsia include elevated blood pressure, exaggerated reflexes, unusual swelling from fluid retention and protein in the urine. The doctor ordered medication be given to Mrs. Koontz at 2:17 a.m., but due to infiltration of the I.V. line, the medication was not administered until 3:15 a.m. The medication failed to regulate Mrs. Koontz' blood pressure. Dr. Ferber then ordered that magnesium sulfate be administered to guard against seizures. The magnesium sulfate did not cause a significant improvement. In view of Mrs. Koontz' failure to continue progressing in her labor, and the risk of pre-eclampsia, Dr. Ferber concluded that the baby would have to be delivered through

caesarean section. Amber Koontz was delivered at 5:07 a.m. Amber was cyanotic, or blue, at birth, and Dr. Braun immediately began providing the child with a 40% oxygen mixture through a process known as "bagging" to help Amber breathe. By 5:10 a.m., Amber's condition had improved and Dr. Braun discontinued bagging at that time. Amber had no immediate symptoms of neurological damage. Amber was later diagnosed with neurological damage.

Trial commenced on January 13, 1992 and lasted for five weeks. Plaintiffs' petition alleged that Amber's physical disabilities resulted from negligent conduct by defendants at or near Amber's birth. The negligent conduct alleged in plaintiffs' petition fell into two categories: 1) that Dr. Ferber should have performed a caesarean section sooner, and 2) that Dr. Braun should have provided a higher percentage of oxygen for a longer period of time after Amber's birth. Plaintiffs sought to hold both hospitals liable for the acts of Dr. Braun, who actively practiced medicine at Children's Mercy Hospital as a neonatologist. Dr. Braun also served as head of neonatology for Research, pursuant to a contract between Research and Children's Mercy. Plaintiffs also sought to hold Research liable for certain acts of its nurses which plaintiffs claimed contributed to the alleged delay in performing the caesarean section. The jury returned a verdict in favor of defendants and this appeal followed.

## Excluded Evidence

Plaintiffs first argue that the trial court erred in refusing to permit them to introduce evidence of the opinions of three physicians on the issues of causation and the standard of care. Plaintiffs claim that the three physicians, Dr. Michael Frost, Dr. Michael Blum and Dr. Lillian Pardo, were all treating physicians of Amber Koontz. Plaintiffs assert the excluded evidence should have been admitted.

■ Plaintiffs first complain about the court's ruling excluding certain portions of two letters written by Dr. Frost which were received in evidence. The portions excluded made reference to Dr. Frost's diagnosis of Amber Koontz as suffering from hypotonic

cerebral palsy, which he viewed as probably the result of perinatal trauma. Plaintiffs have failed to preserve this allegation of error for review. Plaintiffs have not drawn the attention of the court to any portion of the lengthy transcript where the letters were offered and admitted into evidence. Nor have we located in the transcript any discussion or reference to the court's ruling excluding certain portions of the letters. Plaintiffs bear the responsibility of presenting the record on appeal. *Rowe v. Norfolk & Western Railway Co.*, 787 S.W.2d 751, 754 (Mo.App. 1990). Our efforts to determine the point during trial at which the objection and the offer of proof was made, and the point at which the trial court made its ruling, and the reasons for the ruling, have been fruitless. We are unable to review this point.

■ Plaintiffs next complain of court rulings excluding certain portions of Dr. Blum's deposition testimony. Plaintiffs contend that ten separate excerpts from the deposition were erroneously excluded. Although the record does not show that plaintiffs made an offer of proof as to the excluded deposition testimony, they did provide this court with the record made concerning the excluded portions of the deposition testimony. The record, however, does not specify defendants' objections to eight of the excerpts taken from the testimony, nor does it indicate the grounds of the trial court decision to exclude this testimony. Accordingly, this court is again unable to review the rulings concerning eight of these passages.

■ The record does indicate the basis of the trial court ruling on two of the excerpts. In one excerpt of the deposition testimony, Dr. Blum testified as follows:

Q: Doctor, what percent of oxygen were you trained as a pediatrician at Children's Mercy Hospital to use on resuscitation?

\* \* \* \* \* \*

A: 100 percent.

Q: Would you explain what you mean by 100 percent?

A: When I resuscitate a baby, if a baby is having what appears to be respiratory

distress or depressed respirations, to assist the baby, one administers oxygen. I start with 100 percent oxygen to give the most oxygen available to assist in this recovery process or resuscitative process.

The trial court sustained defendants' objection that the testimony was irrelevant, and prevented plaintiffs from reading the passage to the jury. We conclude the trial court could reasonably have found this testimony to be irrelevant. How Dr. Blum was trained to handle resuscitation at Children's Mercy is not the standard by which the defendants are judged. Although Dr. Braun was an employee of Children's Mercy Hospital, providing services to Research pursuant to an agreement between the hospitals, the agreement provided that the regulations of Research Hospital, and not those of Childrens' Mercy, were to be followed. Also, the method Dr. Blum *personally* uses is not the standard. The pertinent inquiry is as to whether the physicians in this case exercised the degree of skill and learning ordinarily used under the same or similar circumstances by members of their profession. *Gridley v. Johnson*, 476 S.W.2d 475, 481 (Mo.1972). The appellant has not demonstrated how the ruling constitutes an abuse of discretion in this case. There is no showing that the trial court abused its discretion in excluding the testimony.

■ Next, defendants objected to the deposition passage in which Dr. Blum expressed his opinion that the reading "minus 5 base excess" *may* reflect any "metabolic acidosis" occurring before 5:30 a.m. Defendants objected on the ground that the question called for speculation and conjecture. The trial court sustained the objection. Plaintiffs fail to explain to this court why such testimony was not speculative. The physician's opinion that the lab reading "may" reflect acidosis is not the same as an opinion, to a reasonable degree of medical certainty, that the lab reading *does* reflect acidosis. It is not clear from the record what Dr. Blum meant. He may have meant such a reading was consistent with the possibility of metabolic acidosis, an opinion which, if expressed to a reasonable degree of medical certainty, would presumably be admissible.

However, it is at least equally likely that he meant that one cannot draw specific conclusions from the reading. Our inability to know what Dr. Blum meant leaves us unable to find an abuse of discretion in excluding the evidence. Moreover, plaintiffs have not explained to this court why this testimony was of significance. Plaintiffs have not shown that the trial court abused its discretion in excluding this deposition passage.

■ Plaintiffs also claim the trial court erroneously excluded portions of Dr. Pardo's deposition. The trial court excluded this testimony as speculative. In discussing Dr. Pardo's testimony, the trial court made the following observations:

> The Court has taken the position with a large portion of the summary material and opinions expressed by Dr. Pardo that the context in which they are given by the doctor, in the sense that if she states an opinion that it is her belief that the child suffers from a mixed motor type of cerebral palsy that she finds to be most likely from perinatal anoxia. And then on page 74 when asked specifically, "Is cerebral palsy of a mixed motor type consistent with perinatal anoxia?" She indicates, not necessarily, or "No, not necessarily." And then to the subsequent question, "In your opinion in this case was it?" And she says, "I don't know." And then, again, when asked as to her opinion as to the condition of Amber where it is expressed on page 77 over onto page 78 her final response at line 11 is that when asked if her opinion was expressed in the letter she said, quote, "And I said it here that it was my—well, okay, suspicion, impression, speculation or whatever word you could debate the way you want it, gentlemen." The Court, again is under the impression that those all taken together substantially erode the probability that is needed for that opinion to be accepted, and, accordingly, has ruled that it will be excluded from the deposition.

The trial court has great latitude in the admission of evidence and the trial court did not abuse its discretion by excluding the deposition testimony as speculative. Point I is denied.

*Children's Mercy "House Staff Manual"*

Next, plaintiffs claim that the trial court erred by refusing to allow plaintiffs to introduce Defendant Children's Mercy Hospital's "House Staff Manual," which discusses the policies and procedures to be followed at Children's Mercy in resuscitation of newborn infants. Plaintiffs argue that the manual was directly relevant to the issue of Defendant Dr. Braun's liability for the injuries sustained by Amber Koontz, since Dr. Braun was an employee of Children's Mercy while he was providing neonatal services to Defendant Research Medical Center. Thus, plaintiffs contend, the evidence bears on the standard of care to be observed by Defendant Dr. Braun in his treatment of the minor child and should have been admitted.

During trial, plaintiffs sought to introduce Exhibits 148 and 155, two pages from the "House Staff Manual" of Children's Mercy Hospital. Exhibit 148 is a blown up reproduction of the cover page of the 1976 edition of the manual in effect at the hospital during August, 1980, when Amber was born. Exhibit 155 is a blown up reproduction of a page from the manual setting forth a general guideline with the heading "Respiratory Distress in the Newborn." This page discussed the general causes of respiratory distress in newborns and oxygen therapy. Plaintiffs offered the exhibits to prove the standard of care applicable to Dr. Braun in his treatment of Amber Koontz at Research Medical Center. The trial court excluded the manual on relevancy grounds. The court found, on the basis of the contract between Children's Mercy and Research, that the rules and regulations in effect at Research governed Dr. Braun's services at Research, not the rules and regulations in effect at Children's Mercy.

■■■■ The trial court is granted broad discretion in determining the relevance of evidence and the trial court's rulings will not be disturbed by this court on appeal unless an abuse of discretion is shown. *Carlyle v. Lai,* 783 S.W.2d 925, 928 (Mo.App.1989). Evidence is considered relevant if it tends to prove or disprove a fact in issue or corroborates other relevant evidence. *Id.* An abuse of discretion is shown when the trial court's ruling is "clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration." *Oldaker v. Peters,* 817 S.W.2d 245, 250 (Mo. banc 1991).

■■■■ Plaintiffs have failed to show that the trial court abused its discretion in this case. Dr. Braun performed services at Research pursuant to an agreement between Children's Mercy and Research which provided that the rules and regulations in effect at Research would govern Dr. Braun's conduct while at Research. The policies and procedures at Children's Mercy were not prescriptive for Dr. Braun's conduct at Research. Therefore, the trial court did not abuse its discretion by excluding the manual from evidence. Point II is denied.

*Cross-examination of Dr. Braun*

Plaintiffs assert the trial court abused its discretion by unduly circumscribing plaintiffs' cross-examination of Dr. Braun by preventing plaintiffs from inquiring into such areas as the regulations of Research and Children's Mercy as to resuscitation of newborns, thereby depriving the jury of relevant and probative evidence.

■■■■ The trial judge has broad discretion in controlling the scope of cross-examination and its rulings will be disturbed only upon a showing of abuse of discretion. *Krez v. Mickel,* 431 S.W.2d 213, 215 (Mo.1968). First, plaintiffs claim that Dr. Braun would not answer a question posed to him. However, as Dr. Braun attempted to answer the question, plaintiffs' counsel interrupted him, apparently anticipating a non-responsive answer, and requested the judge to instruct the witness to answer the specific question asked. Dr. Braun indicated that he could not answer the question in the form it was asked. The trial judge determined that the witness had adequately responded to counsel's question. Plaintiffs' counsel made no further attempt to rephrase the question. Counsel did not make an offer of proof as to what he believed the response would have been. Thus, plaintiffs have failed to preserve this point of error for our review. *See Eickmann*

*v. St. Louis Public Service Co.*, 323 S.W.2d 802, 810 (Mo.1959).

Next, plaintiffs argue that they should have been allowed to question Dr. Braun about hospital regulations relating to circumstances necessitating intubation (i.e., the use of an endotracheal tube). Defendants objected on the ground that the nursing regulations dealt only with the nurses' responsibilities and were inapplicable to the conduct of physicians. Plaintiffs suggest that since the Research nursing regulations did not specify that intubation is a temporary measure to be followed only until a physician can be found, it is impliedly also instructing physicians concerning intubation.

Generally, rules and regulations are not admissible to establish negligence unless expert testimony is offered to establish the standard of care. *Dine v. Williams*, 830 S.W.2d 453, 457 (Mo.App.1992). We find no indication in the transcript that plaintiffs presented expert testimony that intubation should have been employed in the care and treatment of Amber Koontz. The trial court did not err in excluding the cross-examination of Dr. Braun concerning the rules and regulations.

Plaintiffs further complain that Dr. Braun was permitted to evade yet another question. He was repeatedly asked whether a reading of minus 5 constituted metabolic acidosis. Several times he answered that minus 5 did not constitute metabolic acidosis and, in fact, he stated minus 5 "is exactly where the baby should be in transition." Plaintiffs objected to the answer as nonresponsive. The trial judge overruled plaintiffs' objection and plaintiffs tried to formulate the same question in a different way. The trial court sustained defendants' objection that the question had been asked and answered. Plaintiffs have failed to show any trial court error in the cross-examination. The trial court did not abuse its discretion in its ruling on this line of questioning.

Plaintiffs also claim that the trial court erred in sustaining defendants' objection to another question asked by plaintiffs to Dr. Braun. At trial, however, after the objection was sustained, plaintiffs rephrased the question and Dr. Braun was allowed to answer the question over defendants' objection. Thus, plaintiffs could not be prejudiced by the trial court's ruling. Point III is denied.

### Testimony of Drs. Chalub, Kepes and Baska

Plaintiffs next allege that the trial court erred in permitting Dr. Elias Chalub, Dr. John Kepes and Dr. Eugene Baska to testify regarding the possible causes of Amber's injuries other than perinatal trauma. Plaintiffs claim that the three physicians were unable to offer testimony to a reasonable degree of medical certainty as to what caused the child's injuries. Section 490.065, RSMo Supp.1992, requires an expert's testimony to be supported by the type of evidence upon which experts in the field reasonably rely. These three physicians' testimony, plaintiffs suggest, was not supported by the required evidence and the trial court should have either refused to allow these doctors to testify or should have stricken the testimony.

Each physician testified that Amber's injuries did not result from perinatal trauma, but instead resulted from either a primary muscle disease or a developmental malformation of the brain occurring at or before the 34th week of gestation. Dr. Chalub offered his opinion that 1) Amber did not suffer from hypoxia ischemia at the time of birth; and 2) Amber had a developmental malformation of her brain occurring sometime between the 32nd and 34th week of gestation, which affected the development of her muscles causing a predominance of Type 1 fibers. Dr. Kepes' testimony asserted that 1) Amber had Type 1 fiber predominance, since there were twice as many Type 1 fibers as there were Type 2 fibers; and 2) the Type 1 muscle fiber predominance was not caused by hypoxia ischemia. Dr. Baska's opinion was that 1) the Type 1 fiber predominance developed in Amber between the 20th and 28th week of gestation; and 2) that Amber did not suffer any hypoxic injury at birth.

Plaintiffs complain that the doctors did not base their testimony on a reasonable degree of medical certainty. This

claim is without merit. Each physician specifically opined to a reasonable degree of medical certainty that Amber's injuries did not result from a hypoxic injury but rather resulted from either a primary muscle disease or a developmental malformation of the brain occurring at or before the 34th week of gestation. Next, plaintiffs complain that the doctors' opinions primarily addressed what was *not* the cause of Amber's condition, rather than exactly what *was* the cause. Plaintiffs, however, fail to demonstrate any error. We fail to discern any legal or logical problem with such testimony. It is certainly proper for a defense expert to state an opinion as to whether plaintiffs' theory is a theory held by other medical experts. Furthermore, we note plaintiffs actually first engaged in this type of questioning with Dr. Aubry Milunsky, who testified that Amber's condition was not consistent with a primary muscle disease. Finally, plaintiffs suggest that the experts did not have sufficient factual support for their opinions. Whether an opinion is supported by sufficient facts is a question of law. *Spain v. Brown,* 811 S.W.2d 417, 423 (Mo.App.1991). Our review of the evidence shows that the opinions were based on facts supported by the record. The trial court did not err in admitting this testimony. Point IV is denied.

### Testimony of Michael Koontz

█ Plaintiffs complain that the trial court erred in permitting defendants to offer into evidence the hearsay testimony of Michael Koontz. Dr. Svoboda, plaintiffs' expert, testified on cross-examination that based on information obtained from Amber's father, Amber had no neonatal problems after birth. The exact testimony reads as follows:

Q. And, in fact, you noted in your evaluation, in your typed out form, that under conatal history that there were no neonatal problems; is that correct? I think it is the last sentence.

A. This was the history given to me by the parent.

Q. So that was something that was indicated to you by which parent?

A. The father.

Q. The father told you that there were no neonatal problems as part of the history?

MR. PICKETT: I object, Your Honor, it calls for a medical conclusion and summation.

THE COURT: Overruled.

Q. (By Mr. Goza) Am I correct about that?

A. The history from the parent takes from the problem on page one down to three, behavior concerns, number two. Classic medical way of putting it together.

Q. I appreciate that. And am I correct, however, about my specific statement that—

A. I was given no history of any neonatal problems.

Plaintiffs contend that expert testimony was required to determine whether there were any neonatal problems with Amber, and Mr. Koontz was not identified as an expert witness nor qualified as one with the requirements of § 490.065.

Plaintiffs claim that the testimony was admitted in error because Amber's father was not a physician and not qualified as an expert. Amber's father was not testifying before this court during this exchange. It appears from Dr. Svoboda's testimony that Mr. Koontz had relayed information about Amber's history to Dr. Svoboda and, in reliance on this information, Dr. Svoboda recorded in his records that Amber had "no neonatal problems." Plaintiff's objection is clever, but it ignores the common sense fact that a statement by a parent concerning the child's "problems" or lack thereof is a statement concerning observable symptoms, not a statement of medical opinion. It is not clear whether Mr. Koontz used the term "neonatal" in referring to the child as a newborn, but whether he did is immaterial. Either way, Mr. Koontz was speaking as a parent, not as a medical practitioner. It was not error for the court to overrule plaintiffs objection to the testimony as calling for a medical conclusion from a individual lacking medical qualification. Point V is denied.

### Dr. Crawford's Testimony on Causation

Plaintiffs also contend that the trial court erred in permitting defendants to ask Dr. Crawford, one of plaintiffs' experts, whether she had, in her direct examination, expressed any opinions about whether Dr. Braun caused Amber to sustain injury. Dr. Crawford's testimony on direct was limited to the standard of care in resuscitating newborns and to the damages suffered by the minor plaintiff. Both plaintiffs and defendants were limited by an agreed pre-trial order to two expert witnesses on the subject of causation. In concluding the cross-examination of Dr. Crawford, the attorney for Dr. Braun asked: "Doctor, you have not expressed here today any opinions that the actions of Dr. Ferber, the nurses, or Dr. Braun caused or contributed to cause any of the problems that you've described here with regard to Amber, have you?" Dr. Crawford replied, "No, I have not given any opinions." Plaintiffs urge that by raising the issue of causation with a witness whose testimony was limited to non-causation matters, the jury was left with the impression that Dr. Crawford could not link any act or omission of Dr. Braun to Amber's injuries.

However, plaintiffs' counsel did not object to this question when it was asked. Instead, plaintiffs' counsel requested permission to ask Dr. Crawford, on re-direct examination, about her opinions on the subject of causation. Permission was denied. Counsel now claims that the trial court erred in allowing defendants to ask the question to Dr. Crawford about whether she had expressed any opinions on causation.

Plaintiffs did not object to the question at the time it was asked. See Cargill v. Armocido, 476 S.W.2d 506, 508 (Mo. 1972). Plaintiffs have attempted, in effect, to argue that this is a case of "curative admissibility". "Curative admissibility" is the doctrine that allows a party to reply to inadmissible evidence introduced by the opposing party with similar evidence if its introduction would remove any unfair prejudice caused by the admission of the earlier inadmissible evidence. *Phoenix Redevelopment Corporation v. Walker,* 812 S.W.2d 881, 886 (Mo.App. 1991). The doctrine requires that the rebuttal evidence be of the same type or character as the earlier inadmissible evidence. *Id.* Here, plaintiffs have not persuaded this court that the question asked Dr. Crawford was improper. On its face, it was simply a question confirming the scope of the opinions given by Dr. Crawford in her direct examination. The purpose was to clarify that the testimony, which went to both standard of care and damages, did not include the expression of an opinion as to causation. While there may also be other ways to provide for clarification, the question was not clearly improper, and it was within the trial court's discretion whether to permit the question.[1] Moreover, plaintiffs have not established the opinions that Dr. Crawford would have provided if she had been allowed to express opinions on causation. Consequently, plaintiffs have not preserved for appeal any claim that they were entitled to "curative admissibility."[2] Point VI is denied.

### Cumulative Error

Plaintiffs' final point on appeal is that the cumulative errors of the trial court's rulings warrant the granting of a new trial for plaintiffs. An appellate court may grant a new trial based on the cumulative effects of errors, even without a specific finding that any single error would constitute grounds for a new trial. *See DeLaporte v. Robey Bldg. Supply, Inc.,* 812 S.W.2d 526, 536 (Mo.App. 1991). However, relief will not be granted for cumulative error when there is no showing that prejudice resulted from any rulings of the trial court. *Wilkins v. Cash Register Service Co.,* 518 S.W.2d 736, 753 (Mo.App. 1975). In this case, plaintiffs have not shown either error or prejudice resulting from any

1. The parties and the court had previously discussed defendant's intention to ask such a question, and the court had preliminarily decided to permit the question.

2. Even if there were a claim of curative admissibility in this case, it is not clear that the proper "curative" evidence would have been to allow Dr. Crawford to express her opinions on causation. However, it is unnecessary to reach that issue.

rulings on the part of the trial court. Point VII is denied.

Judgment is affirmed.

All concur.