ATTORNEY FOR APPELLANT: Mark Charles Prugh, 328 Historic RT 66 E, Waynesville, MO 65583.
ATTORNEY FOR RESPONDENT: Garrick F. D Aplin, P.O. Box 899, 221 West High Street, Jefferson City, MO 65102.
Honorable Mary K. Hoff
Lisa M. West (Defendant) appeals from the judgment upon her conviction following a jury trial for involuntary manslaughter in the first degree, in violation of Section 565.024, RSMo 2000.[1] The trial court sentenced Defendant to five-years' imprisonment. We affirm.
Factual and Procedural Background
Defendant was charged by substitute information in lieu of indictment with involuntary manslaughter in the first degree, by recklessly causing the death of Victim by striking his head, or by striking his head against an object, or by shaking him, or by a combination thereof. Defendant challenges the sufficiency of the evidence to support her conviction. Viewed in the light most favorable to the verdict, the following evidence was adduced at trial:
*511 At approximately 8 a.m. on the morning of September 8, 2009, Victim's mother dropped off Victim, who was 18 months old, at Defendant's house for daycare supervision. Defendant's two youngest children, who were two and four years old, were also present in the house. Between 8:05 and 8:10 a.m., Victim's mother left for work and Victim was in a high chair eating. Before Victim's mother left, Victim seemed happy. Victim's mother testified that prior to that day, Victim's health was "good" with no problems. She also testified that Victim did not have any bruises anywhere on his head when she dropped him off at Defendant's house on the date of the incident.
At 8:16 a.m., Victim's mother received a phone call from Defendant, who seemed frantic and hysterical. Defendant told Victim's mother that Victim had fallen down the stairs; Defendant asked whether she should call 911. When asked what had happened, Defendant told Victim's mother that she went downstairs into the basement to turn on the light, Victim followed her, and Victim fell and hit his head on the corner of the wall. When asked how Victim was doing, Defendant told Victim's mother that Victim was not opening his eyes, he was moaning a little bit, and he was breathing "funny." Victim's mother told Defendant to call 911. Victim's mother testified that Defendant never mentioned Victim's presence on the stairs or that Victim had hit his head on the floor.
At 8:21 a.m., Officer Spencer Grarup ("Officer Grarup") arrived at Defendant's house to assist with the medical call. Officer Grarup testified that he observed Victim lying on the floor of the living room, unresponsive. Officer Grarup also testified that Victim had a pulse, but he had abnormal breathing and dilated eyes, which caused the officer to suspect a head injury. Officer Grarup testified that he did not observe any outward injuries to Victim's body. Officer Grarup observed that there were 12 carpeted stairs leading down to the basement of Defendant's house.
Officer Grarup also testified that later that day Defendant recounted a different version of the incident. Defendant told Officer Grarup that after feeding the children breakfast, she left the children upstairs in the living room area while she went to the basement. While Defendant was using the bathroom in the basement, she stated that she heard "a series of loud thuds followed by a loud bang." When Defendant came out of the bathroom, she found Victim lying at the bottom of the stairs and crying. Defendant stated that she then picked Victim up and carried him upstairs to the living room, where he began to breathe abnormally.
Officer Grarup and Detective Donnie Hovis ("Detective Hovis"), who was later involved in investigating the incident, both testified that they examined the walls enclosing the stairway and found no dents, scuffs or anything consistent with a child having hit his head on the wall. Additionally, no blood, other bodily fluids, or hair were observed on the stairs.
At approximately 8:24 a.m., Captain David Dalton ("Captain Dalton") and Monica Foeller ("Ms. Foeller"), paramedics with the St. Charles County Ambulance District, arrived at Defendant's home. The paramedics found Victim lying on his back, flaccid, unresponsive to verbal or painful stimuli, breathing "slightly fast" and irregularly, with an irregular heartbeat and dilated pupils in both eyes that were unresponsive to light. Victim's symptoms were consistent with traumatic brain injury and significant pressure on his brain, which are usually seen in victims of high speed motor vehicle accidents. Victim's body did not have any outward signs of trauma, including any injuries-such as bruises, red *512 marks, carpet burns, etc.-typically seen on children who had fallen down the stairs.
Captain Dalton testified that Defendant told him that she had noticed Victim falling down the stairs and that she had gone down the stairs to pick him up and bring him up to the living room. When Ms. Foeller asked Defendant if the stairs were hard or soft, Defendant told her that they were "hard stairs." In the 911 tape played before the jury, Defendant stated that Victim tripped on his sandal.
Samantha Tackaberry ("Ms. Tackaberry"), whose child had also been supervised in Defendant's home in the past, testified that Defendant had recounted to her that she had "cracked the door to the basement" as she was getting ready to take the kids downstairs, that she started feeling nauseous, that she heard Victim screaming and crying when she came out of the bathroom, and that she then ran down to the bottom of the stairs. Ms. Tackaberry testified that Defendant stated to her that at this point, she picked up Victim who became unresponsive.
At trial, Defendant testified that shortly after Victim's mother left on the morning of the incident, Defendant took Victim out of the high chair when he was done eating and put him by the aquarium. Defendant testified that she went downstairs to turn on the lights, went to use the restroom because she was feeling nauseated, heard "a noise," heard the baby crying, ran out, and found Victim at the bottom of the landing with his head against the wall. Defendant testified that her son "was a couple steps up from" Victim. Defendant testified that she picked Victim up and brought him upstairs, called Victim's mother, and then called 911.
Defendant denied physically harming Victim but admitted that Victim was in her care when he got hurt.
After Victim arrived at Cardinal Glennon Children's Hospital, Dr. Ann DiMaio[2] ("Dr. DiMaio"), an attending physician in the pediatric emergency department and member of the child protection team at the hospital, testified that she examined Victim in the emergency room. Dr. DiMaio testified that she observed Victim was intubated and not breathing on his own, he was unresponsive, his pupils were dilated and unresponsive to light, his heart rate was irregular, and he was exhibiting very abnormal posturing or spontaneous neurological movements. Dr. DiMaio also testified that she observed a small, dime-sized bruise on Victim's "right forehead." While she observed no other bruises at that time, Dr. DiMaio testified that bruises sometimes take some time to develop.
Dr. DiMaio testified that thereafter Victim underwent an emergency CT, which showed a "huge subdural hematoma" and evidence that his "brain was shifted." Victim underwent emergency surgery, during which the subdural hematoma was removed to control the swelling. Victim was subsequently declared "brain dead." After surgery, Victim developed a swollen, black and blue bruise around his right eye, which later was determined to be "massive retinal hemorrhages."
Dr. DiMaio testified that in her many years of experience she had commonly seen children in the emergency room who had fallen down stairs. She testified that the "majority of injuries of children who fall down stairs are minor [such as] bumps or lumps, ... some cuts, abrasions, bruises," and that no child in her experience *513 had died as the result of falling down stairs. Dr. DiMaio testified that she had never seen a fatal subdural hematoma in a child who had fallen down the stairs under their own power and that the only reasonable explanation for Victim's injury was abusive head trauma. Dr. DiMaio also testified that Victim's retinal hemorrhages were consistent with abusive head trauma and would have been "immediately incapacitating." Dr. DiMaio concluded that Victim's death was caused by abusive head trauma.
Dr. Kamal Sabharwal ("Dr. Sabharwal") also testified on behalf of the State. Dr. Sabharwal, a medical examiner for multiple counties in the St. Louis area, is board certified in anatomic pathology and forensic pathology and testified that he performed Victim's autopsy. Dr. Sabharwal testified that during Victim's autopsy he observed a "faint light blue contusion or bruise" "just lateral-or to the side of the right eyebrow," and a small bruise just above that. Dr. Sabharwal also testified that Victim's right eyelids contained areas of bleeding beneath the surface of the skin. Dr. Sabharwal testified that he did not believe the eye injury was the result of surgery, but had instead become visible after the surgery. Dr. Sabharwal also observed that Victim's brain was swollen, there was a subdural hematoma on the right side of the brain, there was a subarachnoid hemorrhage, retinal hemorrhages, and optic nerve sheath hemorrhage of the type caused by an inflicted traumatic injury. Dr. Sabharwal did not observe any injuries consistent with Victim falling down the stairs. Instead, he believed Victim's death was a homicide resulting from an inflicted head trauma and blunt impact to the eye. Dr. Sabharwal also testified that the internal injuries to the eyes and the brain could also have been caused by "violent shaking."
Dr. Mary Case ("Dr. Case"), the chief medical examiner for several counties in the St. Louis area, who was board certified in anatomical pathology, forensic pathology, and neuropathology, testified for the State that she examined Victim's brain and eyes following Dr. Sabharwal's autopsy. Dr. Case testified that she had written a subchapter in the Encyclopedia of Forensic and Legal Medicine regarding stairway falls involving children, in which she had summarized numerous existing studies, including the results of those falls. Dr. Case testified that based on her years of experience and knowledge on the subject, young children are most vulnerable to "inertial brain injury," in which there is a "very marked, abrupt movement of the head," and that violent movement often results in subdural hemorrhages, subarachnoid hemorrhages, diffuse axonal injury, and retinal hemorrhages, all injuries which were observed in Victim.
Dr. Case agreed with Dr. Sabharwal's conclusion that the discoloration of Victim's right eye was caused by trauma to the area surrounding the eye rather than by surgery, and that it had not developed prior to the surgery because "it is not unusual for bruises not to show up until a day or two afterwards." Dr. Case also observed the presence of a subdural hemorrhage, subarachnoid hemorrhage, optic nerve sheath hemorrhage, and retinal hemorrhages, which she specifically described as "very significant" and having a "very distinctive pattern that is highly correlated with abusive head injury as opposed to accidental head injury."
Based on her examination of the medical evidence, Dr. Case testified that it was her opinion that Victim's injuries and death were the result of an inflicted inertial brain injury by impact and not an accidental fall. Dr. Case opined that something had struck Victim's head that caused it to *514 move-either by acceleration or deceleration-very abruptly. Dr. Case testified that based on the results of multiple studies, as well as her experience as a forensic pathologist for over 40 years, children who fall down the stairs under "their own power" tend not to suffer fatal injuries. Dr. Case also opined that the evidence showed Victim's diffuse brain injury would have resulted in a "very rapid onset of unconsciousness," and therefore it could not have occurred before Victim was dropped off at Defendant's house.
At the close of all evidence, the jury found Defendant guilty, as charged, of first-degree involuntary manslaughter.[3] Following the jury's recommendation, the trial court sentenced Defendant to five-years' imprisonment. This appeal follows.[4]
Dr. Case's Testimony
In Point I, Defendant argues that the trial court erred in allowing Dr. Case, even absent a Frye [5] hearing, to testify at trial about her ability to distinguish traumatically caused from non-traumatically caused brain injuries because "the protocol/methodology lacked even the basic requirements for being scientifically reliable ... such that it should have been excluded." We disagree.
As an initial matter, we note Defendant waived appellate review of the admission of Dr. Case's testimony when trial counsel affirmatively told the trial court that it could forgo holding a Frye hearing and instead rely on the court's finding in State v. Evans, 517 S.W.3d 528 (Mo. App. S.D. 2015) in determining the admissibility of Dr. Case's testimony. Evans, 517 S.W.3d at 540.
The relevant evidence showed that before trial, Defendant filed a motion requesting a Frye hearing in order to determine the admissibility of Dr. Case's testimony. In support of the motion, Defendant claimed that Dr. Case had previously testified that she had "personally developed" the protocol, that it involved "subjective determinations," but that she had not published any articles to "address or describe this protocol/methodology."
To address the allegations in Defendant's motion, the trial court held a pre-trial hearing during which the following exchange occurred:
[Defense Counsel]: .... I don't know that there's any reason to do a Frye hearing when we've already had a decision from the Court of Appeals and the State Supreme Court not taking it up as ample precedent on this very issue.
THE COURT: I think so too. So long as you're willing to stipulate that we don't need to hear any evidence on it, then I can rule on it based upon your motion.
[Defense Counsel]: I hope-that's exactly why I put the case in like the way I did.
THE COURT: .... So if you're willing to stipulate that I can review the ruling from Rolla that addresses the-that case and take for this case the same findings made by that judge relating to the opinions that are expected to be addressed by ...-[Dr.]Case in this case, then maybe we can resolve it just by me issuing an order on Monday.
*515 I need you to tell me that on the record so otherwise I have to afford your client what I would normally afford a defendant who requested a Frye hearing.
[Defense Counsel]: I am telling you that on the record.
Thereafter, the trial court overruled Defendant's motion, noting that "[s]ince [ State v. Evans ] involves the testimony of the same expert as the case at bar, it is agreed by the parties that the Court[']s finding would be consist[e]nt with that approved in the Evans case."
At trial, when the State offered into evidence Dr. Sabharwal's and Dr. Case's reports, defense counsel stated, "No objection." In addition, Defendant did not object to Dr. Case's testimony as having failed to satisfy the Frye test. Finally, at the hearing on Defendant's motion for judgment of acquittal or for a new trial, trial counsel admitted that he was a "contributing factor" in the fact that no Frye [6] hearing was held.
A timely and specific objection to challenged testimony at trial is necessary to preserve the issue for appellate review. Evans, 517 S.W.3d at 539. Moreover, even plain error review is waived where, as here, "counsel has affirmatively acted in a manner precluding a finding that the failure to object was a product of inadvertence or negligence, such as by affirmatively stating that the defendant has no objection to the admission of particular evidence." State v. Boston, 530 S.W.3d 588, 590-91 (Mo. App. E.D. 2017) (citing State v. Johnson, 284 S.W.3d 561, 582 (Mo. banc 2009) ).
Even if Defendant had not waived appellate review, the trial court did not plainly err in finding sufficient foundation for the admission of Dr. Case's expert testimony because the procedure had been generally accepted by the relevant scientific community.
This court has previously upheld findings that the procedure at issue here was generally accepted in the relevant scientific community as well as the admission of Dr. Case's testimony regarding her interpretation of the BAPP staining results. See State v. Johnson, 402 S.W.3d 182, 186-87 (Mo. App. E.D. 2013) ; Evans, 517 S.W.3d at 540.
Furthermore, Dr. Case was questioned extensively during cross-examination regarding her ability to identify traumatic axonal injury using the BAPP staining procedure and defense counsel was given ample opportunity to discredit the manner in which she interpreted the results of the BAPP procedure. "Generally, the manner in which tests are conducted goes to the credibility of the witness and the weight of the evidence-questions ultimately for the jury to decide." Evans, 517 S.W.3d at 540.
Finally, Dr. Case's testimony was cumulative of other medical testimony, including the medical examiner's, that Victim died of inflicted rather than accidental brain trauma. "It is well-settled that, even if the admission of evidence was error, the ruling is not prejudicial when other properly admitted evidence establishes essentially the same facts." Id.
The trial court did not plainly err in preventing Dr. Case from testifying about her interpretation of the results of the BAPP staining procedure because: 1) Defendant waived appellate review of its admission by telling the trial court that it could rely on Evans in determining the *516 admissibility of such testimony; 2) the procedure has been generally accepted in the relevant scientific community; and 3) Defendant was not prejudiced by its admission, in that it was cumulative of other medical testimony concluding that Victim's injuries were inflicted rather than accidental. Point I is denied.
"Shaken Baby Syndrome" and "Abusive Head Trauma"
In Point II, Defendant argues that the trial court plainly erred in failing to sua sponte prevent or strike testimony regarding "shaken baby syndrome" and "abusive head trauma or injury" because all such testimony was "false testimony" and "fraudulent science." We disagree.
At the outset, we note that Defendant did not object at trial to the allegedly false expert testimony on the basis asserted on appeal. Accordingly, Defendant concedes that we may review her claim, if at all, for plain error pursuant to Rule 30.20. Plain error requires the reviewing court to find that manifest injustice or a miscarriage of justice has resulted from the trial court error. State v. Baumruk, 280 S.W.3d 600, 607 (Mo. banc 2009) ; Rule 30.20.
"Generally, a conviction resulting from the deliberate or conscious use by a prosecutor of perjured or false testimony violates due process and must be vacated." Evans, 517 S.W.3d at 541 (citing State v. Cummings, 400 S.W.3d 495, 504 (Mo. App. S.D. 2013) ). "To succeed on the theory that the State knowingly used perjured testimony, Defendant had the burden to prove that: (1) the witness' testimony was false; (2) the State knew it was false; and (3) the conviction was obtained as a result of the perjured testimony." Id. In Missouri, courts have consistently found no error in the admission of testimony regarding shaken baby syndrome and abusive head trauma. See State v. Richter, 504 S.W.3d 205, 209-10 (Mo. App. W.D. 2016) ; Evans, 517 S.W.3d at 541 ; State v. Candela, 929 S.W.2d 852, 864 (Mo. App. E.D. 1996).
Here, the record demonstrates that all three of the State's expert witnesses acknowledged there was some "controversy" within the medical community as to the validity of a shaken baby syndrome or abusive head trauma diagnosis; however, all three disagreed with those in the minority, who discounted such a diagnosis.
During cross-examination of Dr. DiMaio, defense counsel asked if she was aware of any medical literature suggesting that young children who fell down the stairs under "their own power" could suffer fatal injuries, such as subdural hematomas, retinal, hemorrhages, and encephalopathy, resulting from such falls. Dr. DiMaio distinguished these cases from a plethora of other cases documenting 900,000 children who had fallen down the stairs and where "none of them ha[d] died." Defense counsel also asked Dr. DiMaio whether there was conflict within the medical community regarding the validity of a "shaken baby" or "abusive brain trauma" diagnosis. While Dr. DiMaio admitted that studies remain ongoing as to whether it was a "real event" or something that is "not medically provable," she stressed that almost every health department in the country, including the American Academy of Pediatrics, the National Institute of Health, the CDC, all unanimously warn against shaking babies.
Similarly, during cross-examination of Dr. Sabharwal, defense counsel asked *517 if Dr. Sabharwal was "aware of other forensic pathologists around the country that have found similar results of retinal hemorrhages, subdural hematoma, and the dying of the brain from stairway falls." Dr. Sabharwal responded that he was aware of one other case. Defense counsel also asked if Dr. Sabharwal was "aware of studies in which there have been stairway falls that ha[d] produced skull fractures," and Dr. Sabharwal answered that he was aware of other cases in which that had occurred, but that he did not believe that was the cause of injury in Victim's case. Dr. Sabharwal agreed that "there is controversy" within the forensic and medical community concerning both a diagnosis of shaken baby syndrome and abusive head trauma.
Finally, during her testimony, Dr. Case stated that in 2001, as chair of a committee for the National Association of Medical Examiners she co-wrote a position paper "discussing the consensus among forensic pathologists on the topic of abusive head trauma" and whether shaking without impact can "damage a child fatally." Dr. Case testified that while a "small number" of members within the organization doubted the existence of "shaken baby syndrome," the "controversy" was in regards to whether or not the isolated mechanism of shaking a child could result in serious damage. Dr. Case confirmed that, currently, major medical organizations, such as the Center for Disease Control and Prevention, the National Institute of Health, and the American Academy of Pediatrics, all have taken the position that shaking a young child can indeed cause "severe and even lethal injury," and that there now exists "very much mainstream consensus" within the medical community on this subject.
In conclusion, the evidence at trial showed the existence of a disagreement within the medical and scientific communities about the ability to distinguish traumatic from non-traumatic head injuries. However, "[t]o dispute a doctor's conclusion" is not the same as "to prove that it is 'false.' " Evans, 517 S.W.3d at 541. "The proper way to challenge an expert's method of reaching conclusions is through cross-examination." Id. Here, all of the State's witnesses were extensively cross-examined regarding their conclusion that Victim died as the result of an inflicted head trauma. We find no error, plain or otherwise, in the trial court's admission of the State's "false" or "fraudulent" scientific testimony. Point II is denied.
Ineffective Assistance of Counsel
In Point III, Defendant attempts, unsuccessfully, to raise an ineffective assistance of counsel claim on direct appeal. "Missouri courts have held that 'a claim of ineffective assistance of counsel ... is not cognizable on direct appeal.' " State v. Webber, 504 S.W.3d 221, 230 (Mo. App. W.D. 2016) (quoting State v. Nettles, 481 S.W.3d 62, 69 (Mo. App. E.D. 2015) ). "A claim of ineffective assistance of counsel is not cognizable on direct appeal but must be presented pursuant to the procedure set forth in Rule 29.15 or 24.035 which provide for the development of a full and complete record." Id. (quoting State v. Brown, 438 S.W.3d 500, 506 n. 5 (Mo. App. S.D. 2014) ). "These rules provide the exclusive procedure through which post-conviction relief because of ineffective assistance of counsel may be sought." Id. Accordingly, Point III is denied without further review.
Actual Innocence
In Point IV, Defendant argues that the trial court erred in permitting testimony regarding shaken baby syndrome and abusive head trauma, and there was insufficient evidence from which a jury could have reasonably found that Defendant was guilty as charged, "because [Defendant] is actually innocent, in that no reasonable juror would have voted to convict [her] absent the improper evidence." As this point is redundant of arguments made in Defendant's Points I, II, and V, we deny *518 Point IV for the reasons discussed in our resolution of those points.
Sufficiency of the Evidence
In Point V, Defendant argues the trial court erred in denying her motion for new trial because the evidence was insufficient to support her conviction for involuntary manslaughter in the first degree. Specifically, Defendant argues that no jury could have reasonably found that Defendant recklessly caused Victim's death because there was an "absence of sufficient evidence ... connecting [Defendant] to the child's death" and, therefore, the trial court erred in "confirming the jury's guilty verdict." We disagree.
Our review of a challenge to sufficiency of the evidence to support a conviction is limited to a determination of whether the State introduced sufficient evidence at trial from which a reasonable trier of fact could have found each element of the offense to have been established beyond a reasonable doubt. State v. Oliver, 293 S.W.3d 437, 444 (Mo. banc 2009). We accept as true all evidence and reasonable inferences favorable to the verdict, disregarding contrary inferences "unless they are such a natural and logical extension of the evidence that a reasonable juror would be unable to disregard them." Id. Additionally, we may draw inferences from either direct or circumstantial evidence, so long as the inferences are logical, reasonable, and drawn from established fact. State v. Burnett, 492 S.W.3d 646, 650 (Mo. App. E.D. 2016).
Pursuant to Section 565.024, "[a] person commits the crime of involuntary manslaughter in the first degree if he or she ... [r]ecklessly causes the death of another person." Section 565.024.1(1). "A person 'acts recklessly' or is reckless when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." Section 562.016.4.
Here, contrary to Defendant's claim, there was sufficient evidence from the State's medical testimony and other testimony from which the jury could have reasonably found that Defendant recklessly caused Victim's death.
At the time that Victim suffered his fatal injuries, he was under the care and supervision of Defendant, who was the only adult present in the home. When Victim was dropped off, he seemed happy, his health was "good," and he did not have any bruises anywhere on his head. Medical testimony established that Victim's diffuse brain injury would have resulted in a "very rapid onset of unconsciousness" and that the injury could not have occurred before Victim was dropped off at Defendant's house.
After police arrived, Defendant provided several inconsistent statements regarding the incident that caused Victim's injuries, including whether she was upstairs, downstairs, or on the stairs at the time of the incident, whether Victim tripped on his sandal, whether Victim hit his head against the stairway wall or the floor, whether her children were also present on the stairs, and whether she first called 911 or Victim's mother after the incident.
Officers who arrived at the scene testified that they did not find any marks on the stairway walls that would have been consistent with an impact by Victim's head, and no blood, bodily fluid, or hair was identified. Additionally, when police first arrived, Victim was lying in the front living room, not downstairs. Several witnesses independently observed that Victim did not have any injuries to his body that they would have expected to see had Victim *519 fallen down the stairs. And three medical experts-Dr. DiMaio, Dr. Sabharwal, and Dr. Case-all were consistent in their testimony that Victim's death was caused by inflicted trauma and was not the result of an accident, such as falling down the stairs.
Evidence that Victim was injury-free before being left in Defendant's care supports a reasonable inference that Defendant inflicted Victim's injuries. Evans, 517 S.W.3d at 537. In addition, here, a juror could reasonably infer, from the collective impact of the evidence presented at trial, that defendant was guilty of first-degree involuntary manslaughter. See State v. Yoksh, 989 S.W.2d 227, 232 (Mo. App. W.D. 1999) (finding that the medical and circumstantial evidence with regard to the death of the child victim was sufficient to support the jury's conviction of murder in the second degree).
In State v. Yoksh, the defendant who operated a day care, left the day-care children in the care of her husband. Id. at 228. When the mother of a baby arrived to pick the baby up, he was non-responsive and his breathing was labored. Id. at 229. The child was rushed to the hospital, but died from his extensive injuries, which included subdural and retinal hemorrhages. Id. at 230. In Yoksh, the circumstantial evidence included the following: (1) the defendant was the only adult in the house when the child received his injuries; (2) the child's crying irritated him; (3) the child was acting normally, and appeared to be healthy, before the defendant was alone with him. Id. at 233. Finally, in Yoksh, as in the case at hand, there were conflicting statements made to the police right after the incident occurred. Id. The court opined that those conflicting statements also "undermines the defendant's version of the events." Id.
In the instant case, as in Yoksh, the record established that Defendant was left alone with a previously healthy baby who fell unconscious in her care and then required treatment for traumatic head injuries. Furthermore, in this case, evidence was presented which showed that the injury occurred at the same time that the baby lost consciousness. Thus, there was sufficient evidence from which a reasonable juror might have that Defendant recklessly caused the death of Victim. The trial court did not err in denying Defendant's motion for acquittal or in entering judgment of conviction for involuntary manslaughter in the first degree. Point V is denied.
Justice for Victim
In Point VI, Defendant argues the trial court erred and abused its discretion in permitting the State to ask the jury for "Justice" for Victim and his family because such statements and arguments constituted improper personalization and prevented the jury from ensuring Defendant a fair trial. We disagree.
Prior to trial, Defendant filed a motion in limine, which inter alia asked the court to prohibit the State from telling the jury during opening statement or closing argument "that the role of the jury or that the purpose of the trial is to seek and enforce justice for [Victim] or the [Victim's] family," because such statements improperly shifted the role of the jury away from determining whether the State had proven that Defendant committed all the necessary elements of the crime charged beyond a reasonable doubt.
During the State's opening statement, the prosecutor stated, "Maybe [Defendant] regretted it, but the unimaginable damage was done and can never be undone and justice demands that there be a consequence." Later, the prosecutor concluded, "A life was taken just after it got started. And we're here to ask you people for *520 justice for [Victim]." At this point, counsel from both sides approached the bench, and, outside the hearing of the jury, Defense counsel renewed the objection from the motion in limine regarding comments about "justice for [Victim]." Defense counsel then argued that the prosecutor had violated the court's order sustaining his motion. The prosecutor stated, "I don't recall that order." Defense counsel then asked for a mistrial. The trial court replied, "I'm going to send the jury out. We'll research this and see what the answer is, if that is appropriate or not."
Following a short recess, and again outside the hearing of the jury, the trial court determined that the prosecutor's comment "was contrary to the motion in limine order that [the court] had made verbally," and noted that the prosecutor "has commented off the record that his recollection of that ruling in the motion in limine was limited since we talked about a number of things that day.... And so he indicates it was inadvertent in his use of the term. I don't have any reason to dispute that." At this point, the trial court ordered the prosecutor "not to further make that argument," but did not declare a mistrial or instruct the jury to disregard the statement because doing so would "once again [be] using those same words."
Thereafter, during Defendant's opening statement, defense counsel stated, "[T]here is no way to talk about the sympathy and empathy one wants to have for a mother and a father who lose their child. It's unbelievable. And they deserve all of our sympathy, all of our sympathy. But it isn't going to solve anything by convicting and imprisoning [Defendant] on this evidence." The following morning, the trial court noted that they had "continued to address the issue of the comment made by the prosecutor in opening relating to justice for the child ... [and] continued to look at authority for that." Relying on State v. Kee, 956 S.W.2d 298 (Mo. App. W.D. 1997), where the prosecutor had made a comment "very similar" to the one in the instant case, the trial court stated that it would modify its previous rulings and follow Kee, thereby directing the prosecutor that he was "no longer restricted from making that argument and further arguments in the case."
Later, during closing argument, the prosecutor stated, "[Victim's family] ask for only one thing. All they want is the truth. All they want is the truth. [A]ll they want is accountability." At the end of closing argument, the prosecutor stated, "So [Victim's] family-after seven years they come before you asking for justice. They ask for answers." The prosecutor concluded: "At least in the decades to come, as the [Victim's family] remember their little boy who died-who was 18 months old, they'll know that justice is done." At the beginning of rebuttal argument, the prosecutor stated, "[Defendant] will get infinitely more justice from you than [Victim] got from her." At this point, defense counsel renewed the objection "concerning the justice for [Victim] that was filed" in her motion in limine. The trial court overruled the objection. The prosecutor then reiterated, "[Victim] didn't deserve this. There needs to be an accounting for this."
Here, contrary to Defendant's claim, the trial court did not abuse its discretion in permitting the State's argument, nor was the State's argument improper personalization. "Substantial latitude is allowed during closing argument, and the trial court is vested with broad discretion in determining when counsel has exceeded the permissible scope of argument." State v. Kee, 956 S.W.2d 298, 303 (Mo. App. W.D. 1997). Even if closing argument is found improper, reversal is justified "only where the defendant demonstrates *521 that the argument had a decisive effect on the jury's determination." Kee, 956 S.W.2d at 303. "In order to have a decisive effect, there must be a reasonable probability that, had the comments not been made, the verdict would have been different." Id.
In Kee, the court held that a similar comment clearly fell within the parameters of permissible argument under Missouri law. Kee, 956 S.W.2d at 304. "A prosecutor is permitted to argue general propositions regarding ... the jury's duty to uphold the law." Id. The court held that the prosecutor's reference in closing argument to protecting battered women, upholding law, and doing justice did not inflame passions and prejudices of jury, and was permissible reference to personal safety of community's citizens, jury's duty to uphold law, and proposition that protection of public rests with jury. Id. ; see also State v. McFadden, 391 S.W.3d 408, 426 (Mo. banc 2013) (the state is permitted to argue the need for strong law enforcement, the prevalence of crime in the community, and that conviction of the defendant is part of the jury's duty to uphold the law and prevent crime). Similarly, here, the trial court did not abuse its discretion in permitting the State to ask the jury for "justice" for Victim and his family. Point VI is denied.
"Suppressed" Photo of Victim
In Point VII, Defendant argues the trial court abused its discretion in denying her motion for a new trial because the State committed a Brady [7] violation in allegedly failing to disclose a an exculpatory photograph of a bruise to Victim's head taken two days before the injury occurred. We disagree.
"The trial court's decision whether to grant a motion for new trial is presumed correct and will be reversed only when an abuse of discretion has occurred." State v. Peeples, 288 S.W.3d 767, 775 (Mo. App. E.D. 2009) (citing State v. Merrick, 257 S.W.3d 676, 680 (Mo. App. S.D. 2008) ). The State violates a defendant's due process rights pursuant to the holding in Brady when a prosecutor "suppresses evidence that is favorable to the defendant and material to either guilt or punishment." State v. Salter, 250 S.W.3d 705, 714 (Mo. banc 2008). In order to prove a Brady violation occurred "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Taylor v. State, 262 S.W.3d 231, 240 (Mo. banc 2008) (quoting Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) ). " Brady, however, only applies in situations where the defense discovers information after trial that had been known to the prosecution at trial." Salter, 250 S.W.3d at 714 (citing State v. Myers, 997 S.W.2d 26, 33 (Mo. App. S.D. 1999) ). "If the defendant had knowledge of the evidence at the time of the trial, the State cannot be faulted for nondisclosure." Id.
At trial, during direct examination, Victim's mother confirmed that State's Exhibit 37 was a picture of Victim taken "two days before he was injured." The State offered the exhibit for admission into evidence, and when the trial court asked whether there was any objection, defense counsel stated, "No objection, your Honor." Later, during re-direct examination, the prosecutor asked Victim's mother if Victim had any bruises on his forehead or anywhere on his head when she dropped *522 him off at Defendant's on the day he was injured. Victim's mother replied, "No."
In her motion for new trial, Defendant alleged that the State failed to disclose a photograph of Victim taken two days before he was injured and that the photograph was published in the St. Louis Post Dispatch. Defendant alleged that the State provided the exculpatory photograph to the paper following the jury's verdict, which "clearly shows a bruise above the [Victim's] right eyebrow in the same place that State's witnesses/experts ... claimed to have observed a point of impact contusion."
During the hearing on Defendant's motion, defense counsel argued that the State had not disclosed the photograph and that consequently defense counsel did not have an opportunity to cross-examine any of the State's witnesses concerning the particular bruise. The prosecutor denied that the photograph showed a bruise. Additionally, the prosecutor stated that the photograph had, in fact, been disclosed to Defendant and that the photograph published in the newspaper was simply a "cropped" and enlarged version of the photograph it had disclosed to Defendant.
As proof of the disclosure, the State provided the court with copies of an email and two attached photographs. The court reviewed the exhibits and agreed that "[o]ne of the [the two photographs] may well be a larger scale photo of [the Defendant's exhibit] attached to the motion for new trial, which may well be a cropped portion of that photo." The State noted that it had entered the other photograph into evidence at trial, and that it had been taken the same day as the one published in the newspaper.
When the trial court asked whether defense counsel had received the email and attachments, defense counsel stated that he never received "any cropped photograph or any enlargement like that that was depicted in the Post Dispatch article." The State responded that they had not possessed the "cropped picture either," and that any alteration to the original had been performed by the newspaper.
After examination of the exhibits, the trial court agreed that the exhibit attached to Defendant's motion for new trial "does appear potentially ... that that may well be a cropped portion of a photograph which reports by the State to have been attached to an e-mail from the paralegal at the prosecutor's office to [defense counsel] that was dated November the 6th, 2015. It has two photographs attached to it." Thereafter, the trial court denied Defendant's motion for a new trial.
Here, contrary to Defendant's claim, there is no evidence that the State failed to disclose a photograph of Victim taken two days before he allegedly fell in Defendant's home. At the hearing on Defendant's motion for a new trial, the State produced evidence that it had disclosed the photograph to the defense prior to trial; Defendant produced no evidence controverting the State's claim. Additionally, the State offered into evidence at trial a companion photograph of Victim that was taken on the same day, and it was admitted without objection from Defendant.
Based on the record before us, the trial court did not abuse its discretion in denying Defendant's motion for a new trial as Defendant failed to show that the State committed a Brady violation by suppressing any exculpatory evidence. Point VII is denied.
Instruction No. 6
In Point VIII, Defendant argues the trial court erred in instructing the jury in that the instructions given, specifically *523 Instruction No. 6, failed to ensure a unanimous jury verdict. We disagree.
We review a claim of instructional error de novo. State v. Rycraw, 507 S.W.3d 47, 59 (Mo. App. E.D. 2016). However, we will only reverse a jury's verdict based on an erroneous instruction if the defendant has suffered prejudice. Rycraw, 507 S.W.3d at 59. "If the giving of [an] instruction is error, it will be held harmless only when the court can declare its belief that it was harmless beyond a reasonable doubt." Id. (quoting State v. Erwin, 848 S.W.2d 476, 483 (Mo. banc 1993) ). "A defendant need not establish that the jury was more likely than not to have misapplied the instruction. It is sufficient that there is a 'reasonable likelihood that the jury has misapplied the challenged instruction' in a way which violates the defendant's constitutional rights." Id.
While criminal defendants have the right to a unanimous jury verdict, "[a] 'jury need only be unanimous as to the ultimate issue of guilt or innocence, and need not be unanimous as to the means by which the crime was committed.' " State v. Watson, 407 S.W.3d 180,184 (Mo. App. E.D. 2013) ; Richter, 504 S.W.3d at 211 (quoting State v. Fitzpatrick, 193 S.W.3d 280, 292 (Mo. App. W.D. 2006) ).
During voir dire, defense counsel argued that the jury had to agree "unanimously on the act [or method] that occurred that results in this particular conviction." The prosecutor argued that because it was the "same" crime and not a "different" crime, the jury was only required to "unanimously agree on this crime." The prosecutor further argued that here it was "medically impossible to know which [method] happened." The trial court stated that it would take a look at State v. Celis-Garcia, 344 S.W.3d 150 (Mo. banc 2011) to prepare for instructions or final argument to the jury.
Before swearing in the jury, and at the State's request, the trial court addressed the issue of the proper verdict director in this case and noted: "[A]t first blush, it appears to me that this falls within the multiple-acts definitions." The State argued that "a jury need only be unanimous as to the ultimate issue of guilt or innocence and need not be unanimous as to the means by which the crime itself was committed." The trial court disagreed and stated that "at some point we're going to have to instruct the jury that 12 of them are going to have to find on one of those particular acts of violence towards this child."[8]
During the instructions conference, the trial court indicated that it intended to give Instruction No. 5 as submitted by the State.[9] Defendant objected, saying, "Our position is that the State needs to elect which theory it's pursuing by electing one of those particular-or, perhaps, multiple particular verdict directors ... in order to ensure the defendant's right to a unanimous verdict."
The State then objected to Instruction No. 6 on the ground that "this case is not in the line with Celis-Garcia." The State argued further that "there is one crime that the defendant is alleged to have committed of involuntary manslaughter in the [first] degree that happened on one day and that ... each of those are a mechanism for causing the crime of recklessly causing the death of [Victim], which is the ultimate issue in this case." Defendant responded:
*524 "We do agree that some kind of modification of the instructions is needed or an instruction to comply with Celis-Garcia. We agree with the Court on that."[10] The trial court noted that Instruction No. 6 was being given because it believed Celis-Garcia and State v. Watson, 407 S.W.3d 180 (Mo. App. E.D. 2013) were "applicable to this situation." The trial court concluded that in giving this instruction, it was assuring "a unanimous verdict as to which mechanism has been proven by the State."
As given, Instruction No. 5 stated, in pertinent part, that the jury would find Defendant guilty of involuntary manslaughter in the first degree if it found beyond a reasonable doubt that Defendant "caused the death of [Victim] by striking his head, or by striking his head against an object, or by shaking him" and that Defendant did so recklessly. Instruction No. 6 stated:
The State of Missouri ... alleges that on or about September 8, 2009 through September 9, 2009, defendant committed the act of involuntary manslaughter in the first degree, to wit: defendant recklessly caused the death of [Victim] by striking his head, or striking his head against an object, or by shaking him , in Instruction No. 5.
To convict defendant of involuntary manslaughter in the first degree, one particular mechanism, listed in Instruction No. 5, first paragraph, of recklessly causing [Victim's] death must be proved beyond a reasonable doubt, and you must unanimously agree as to which mechanism has been proven. You need not unanimously agree that defendant committed all the mechanisms listed in Instruction No. 5, first paragraph. [Emphasis added.]
Here, while the jury should not have been required to unanimously find which specific means Defendant used to recklessly cause Victim's death in order to find her guilty of involuntary manslaughter in the first degree, the trial court nevertheless instructed the jury to do so in Instruction No. 6. Moreover, both the State and Defendant argued in closing argument that the jury had to unanimously agree that one of those particular means had been proven. Therefore, Defendant suffered no prejudice as the result of any presumed trial court error because the trial court's instructions required the jury's verdict to be unanimous and required the State to bear its burden. See Watson, 407 S.W.3d at 185-87 (jury instruction stating that jury must unanimously agree on one act to support offense and that they must agree to same act was sufficient to satisfy defendant's right to jury unanimity); Richter, 504 S.W.3d at 211-12 (a disjunctive submission of alternative means by which a single crime is committed is proper if both alternatives are supported by sufficient evidence and the alternative means are in the same "conceptual grouping"). In addition, it is well-settled that "[a] criminal jury instruction imposing an additional burden on the State beyond that which is legally required in order to establish guilt does not prejudice the defendant." State v. Myles, 479 S.W.3d 649, 659 (Mo. App. E.D. 2015) (quoting State v. Livingston, 801 S.W.2d 344, 350 (Mo. banc 1990) ). The trial court did not prejudice Defendant by instructing the jury that they were required to unanimously agree as to which *525 one mechanism caused Victim's death. Point VIII is denied.
Cumulative Error
In Point IX, Defendant argues that the trial court erred in denying her motion for new trial because "the evidentiary rulings cited in Point Relied on IX, in combination with those made in Points I through VIII ... result[ed] in a reasonable probability that the errors, collectively and individually, affected the outcome of the trial." We disagree.
"An appellate court may grant a new trial based on the cumulative effects of errors, even without a specific finding that any single error would constitute grounds for a new trial." Koontz v. Ferber, 870 S.W.2d 885, 894 (Mo. App. W.D. 1993). "However, relief will not be granted for cumulative error when there is no showing that prejudice resulted from any rulings of the trial court." Id. Here, for most of the identified issues, Defendant cites no authority to support her claim of error. Because Defendant "has failed to persuasively identify any error during the trial, the point must fail." Giles v. Riverside Transp., Inc., 266 S.W.3d 290, 300 (Mo. App. W.D. 2008). Additionally, given the evidence of guilt presented at trial, Defendant fails to show that the alleged errors resulted in manifest injustice. Koontz, 870 S.W.2d at 894. Point IX is denied.
Conclusion
The judgment is affirmed.
Colleen Dolan, Presiding Judge and Lisa S. Van Amburg, Judge: concur

Unless otherwise indicated, all further statutory references are to RSMo 2000 as amended.

Dr. DiMaio is board-certified in pediatrics, pediatric emergency medicine, and child protection, and has almost 30 years' experience working in emergency pediatric medicine in New York City and St. Louis.

The jury was instructed on involuntary manslaughter in the first degree and the lesser-included offense of involuntary manslaughter in the second degree.

Additional evidence relevant to Defendant's points on appeal will be set out as needed in the discussion sections of this opinion.

Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

Defendant also acknowledged on appeal that the trial court offered him a Frye hearing, but that trial counsel "turned the offer down."

Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The State and Defendant both prepared memos for the trial court regarding their respective positions on the proper instruction to be given.

Defendant submitted several alternative instructions to Instruction No. 5 (Instruction No. 5(a)-5(h) ) that contained one mechanism or a combination that were not given by the trial court.

Defendant also submitted Instruction No. 6a, which defense counsel argued was more appropriate than Instruction No. 6 because it "specifically list[ed] the specific mechanisms," and because it instructed the jury that "unless you can unanimously agree as to which specific act was committed, you cannot find the Defendant guilty of involuntary manslaughter." This too was rejected by the trial court.